JOE B. WILLS v. CENTRAL ICE AND COLD STORAGE COMPANY ET AL.

Decided May 20, 1905.

**1.—Conspiracy to Secure Monopoly—Right of Action—Test.**

A conspiracy can not be made the subject of a civil action, although damages result, unless something is done which without the conspiracy would give a right of action; the true test as to whether such action will lie being whether the act accomplished after the conspiracy is formed is itself actionable.

**2.—Same—Refusal to Sell to Dealer.**

A person has an absolute right to refuse to have business relations with any person whomsoever, even though the refusal is the result of whim, caprice, prejudice or malice, but one person may not, from such motives, influence another to do the same thing.

**3.—Same—Fact Case.**

Evidence considered in an action by an ice dealer for damages resulting from an alleged conspiracy to secure a monopoly of the ice business and to boycott plaintiff by refusing to sell him ice, and held not to warrant submitting the case to the jury, since it showed only a refusal by one of defendants to sell ice to plaintiff.

**4.—Court and Jury—Instructing Verdict.**

Where there is slight testimony, but its probative force is so weak that it only raises a mere surmise or suspicion of the existence of the facts sought to be established, it is the duty of the court to instruct a verdict.

Appeal from the District Court of Dallas. Tried below before Hon. Richard Morgan.

*W. M. Holland,* for appellant.—1. One who suffers injury by reason of a conspiracy formed for the purpose of preventing competition in trade in commodities in common use, which combinations are declared illegal by statute, has a right of action to recover damages sustained. 8 Cyc. of Law, p. 651; Rourke v. Elk Drug Co., 77 N. Y. Supp., 373; 75 N. Y. App. Div., 145; Murray v. McGarigle (Wis.), 34 N. W. Rep.,

522; Montague v. Lowry, 193 U. S., 38; Texas Anti-Trust Statute of 1903; Supp. Sayles Statutes, pp. 559, 560; Delz v. Winfree, 80 Texas, 400; International & G. N. Ry. v. Greenwood, 2 Texas Civ. App., 77; Olive v. Van Patten, 7 Texas Civ. App., 630.

2. The judge is not authorized to direct verdict for the defendants if the plaintiff has introduced any evidence tending to sustain the material allegations of his petition. Newberger & Sons v. Heintze & Co., 3 Texas Civ. App., 261; Ney v. Ladd, 68 S. W. Rep., 1014; Burnett v. Burnett, 11 Texas Ct. Rep., 366; Lee v. International & G. N. R. R., 89 Texas, 588; Joske v. Irvine, 91 Texas, 581.

*Read & Lowrance, Crane & Gilbert, Muse & Allen* and *Cockrell & Gray,* for appellees.—1. The court did not err in giving peremptory instruction for the defendant, because there was no evidence to support any of the material allegations in plaintiff's petition. Delz v. Winfree, 80 Texas, 403, 25 S. W. Rep., 50; Olive v. Van Patten, 25 S. W. Rep., 429; Grand Lodge v. Schuetze, 83 S. W. Rep., 241; State v. Shippers C. & W. Co., 69 S. W. Rep., 58; Hunt v. Simonds, 19 Mo., 589; Cooley on Torts (2d ed.), secs. 126, 278, 690.

2. An individual can not recover damages on account of a conspiracy unless the facts alleged and proved constituted damages to him personally, independent of the alleged conspiracy. A person or corporation has an absolute right to refuse to have business relations with any person whomsoever, for any cause, and the law does not force any one to sell to another. Delz v. Winfree, 80 Texas, 403; Grand Lodge v. Schuetze, 83 S. W. Rep., 241; Hunt v. Simonds, 19 Mo., 583, 586; Cooley on Torts (2d ed.), secs. 124-126, 278, 690; Bishop on Non-contract Law, sec. 354; 6 Am. and Eng. Ency. Law, (2d ed.), 873, 874.

3. It was the duty of the court to instruct a verdict for appellee, because the testimony adduced at the trial of the case did not, in legal contemplation, amount to "any evidence," and "it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise of suspicion of the existence of the fact sought to be established. Joske v. Irvine, 91 Texas, 582; Improvement & Ry. Co. v. Munson, 14 Wall., 442, 81 U. S., 442; Wittkowsky v. Wasson, 71 N. C., 454; Banlec v. Railway, 59 N. Y., 356; Texas Loan Agency v. Fleming, 49 S. W. Rep., 1041.

TALBOT, ASSOCIATE JUSTICE.—We adopt appellant's statement of the nature of the suit as follows: This suit was instituted by appellant in the Forty-fourth Judicial District Court of Texas on March 24, 1904, against appellees, Central Ice and Cold Storage Company, C. L. Wakefield, doing business as Dallas Ice and Fuel Company, the Peoples' Ice Company, Armstrong Packing Company and Dallas Ice Factory, Light and Power Company. It is a suit in the nature of a civil conspiracy for damages on account of injuries suffered by appellant by reason of an alleged conspiracy entered into by appellees on or about March 1, 1904, for the following purposes, viz: to secure a monopoly of all the ice manufactured in the city of Dallas for local consumption; to lessen competition and to fix and maintain the price of ice in the city of Dallas; to prevent lawful competition in the dealing of ice in the city

of Dallas; to boycott appellant and to refuse to sell ice to appellant and to otherwise unlawfully meddle and interfere with appellant's business and deprive him of making a living out of his business as a wholesale and retail dealer in ice.

The defendants answered by general and special exceptions and general and special denial. A jury was empaneled to try the case, but upon the close of plaintiff's evidence the court, upon motion of the defendants, gave a peremptory instruction to the jury to return a verdict in their favor, which was done and judgment entered in accordance therewith. From this judgment appellant has appealed.

The petition discloses a cause of action, and the sole question presented for our determination is, whether or not the evidence was sufficient to require the submission of the case to the jury. C. L. Wakefield, one of the defendants and witness for plaintiff, testified by deposition: "I am interested in Dallas Ice and Fuel Company. The firm doing business under this name was formed in February, 1904. It was formed for the purpose of buying and selling ice in Dallas. It is a simple partnership composed of C. L. Wakefield, J. E. Cockrell and E. Gray, who alone compose the firm. At the time this suit was filed there were, I think, five factories or companies engaged in the manufacture of ice in Dallas, viz: the Lemp Company, the Armstrong Packing Company, the Dallas Ice Factory, Light & Power Company, the Peoples' Ice Company and the Central Cold Storage Company. I have a contract for the purchase of a certain amount of ice from the Armstrong Packing Company, the Dallas Ice Factory, Light and Power Company, the Peoples' Ice Company and William Lemp. These contracts were made with me and in my name. The contracts are in writing and were made with the executive officers of said three companies and with William J. Lemp, personally. I do not attach copies, because these are contracts relating to a private business and in which the plaintiff in this case is not interested. We bought some wagons and teams from the Lemp people. We bought them outright and paid for them part money and part in our notes. They have no interest whatever in our business. We have paid about two-thirds of the cost of such wagons and teams in money and owe the balance on notes. It was not agreed in said contract that the Lemp people should not sell ice to be used in the city of Dallas. They are at perfect liberty so far as our contract is concerned, to sell ice to whomsoever they please and where they please. The Lemp people did run wagons and sell ice to retail dealers last year, but decided not to do so this year. It is our understanding that they have long desired to get out of the retail business. The ice department of the Lemp people have telephone number 712 and Dallas Ice and Fuel Company has telephone number 712 in its office. We pay the additional charge to get our names also on this telephone number. We need phone service there where we get, load and deliver a great deal of ice, and we simply pay for the privilege. My agreement to purchase ice from the Peoples' Ice Company is in writing. I do not attach a copy for reasons already given. The contract is signed by the president and secretary of said company. We were not to take their entire output, for reasons already given. I decline to go into our private affairs. We have simply complied with our contract with them and have taken and paid for the ice

we have contracted for. We bought part of their wagons and teams, not all. They sold some of the balance to other retail dealers. Under our contract it was not agreed that the Peoples' Ice Company should sell to no one else in Dallas. They can sell to whom they please, and I understand they are selling other dealers like ourselves. I do not know what you mean by independent dealers. There is no community of interest between our firm and this company. We are as independent dealers as the plaintiff or any one else. Mr. Jones while in our employ made a suggestion that we cut the selling price of ice so as to get more custom for our business. The suggestion was prompted by Fort Worth ice being shipped into Dallas and sold here. He seemed to think the Dallas factories should sell all the ice sold in Dallas. Whether Mr. Jones made this suggestion in our interest, as he was then working for us, or in the interest of the Peoples' Ice Company, of which he is a large stockholder, I do not know. But, in any event, we declined to adopt the suggestion or make any cut. We understand that Mr. Jones, for the Peoples' Ice Company, sold a lot of white ice at $12\frac{1}{2}$ cents to whosoever would buy it. We know of such sales by hearsay. But, as our consent was not necessary, it was not asked. The Peoples' Ice Company is not a subsidiary company to our firm. We have nothing on earth to do with them save we buy ice from them. It is not a fact that the ice companies operating in Dallas agreed with my company or myself that they were not to sell to any person, firm or corporation dealing in ice in Dallas city, except myself or my company. They can sell ice to whomsoever they please, so far as any contract we have with them is concerned, and on whatever terms they see fit. I did not engage in this business for the purpose of securing a monopoly or a partial monopoly, but did engage in it because I thought by economy, with lawful, honest and fair men for partners, I could do my share of the business and make some money in a legitimate way. Yes, I was formerly manager of Dallas Ice Factory, Light and Power Company. My connection with said company wholly ceased on February 29, 1904, when I resigned to embark in my present business. It is not a fact that some other party is manager in name only of said Power Company and that I am still its manager in fact. I have nothing whatever to do with said company save that we buy ice from it. I decline to answer the question as to the approximate amount of money, if any, paid by myself or Dallas Ice and Fuel Company to Dallas Ice Factory, Light and Power Company up to the present time. This is a private matter. Mr. Armstrong represented his company in contracting with me for the sale of ice. Said contract was in writing. I decline to give its terms for the reasons already given. The question as to whether said contract was in violation of the antitrust law was mentioned when the subject was first broached. It is a fact that neither myself nor my firm have any agreement, contract or understanding of any kind, form or character with my codefendant, the Central Ice and Cold Storage Company. Neither myself nor Dallas Ice and Fuel Company ever at any time had any understanding, contract or agreement with said codefendant. I never confederated or conspired with any person whomsoever to injure or affect the business of plaintiff or to prevent him from buying ice wherever he could."

Joe B. Wills, plaintiff, testified: that he had been engaged in the ice business since March, 1903; that. he was well acquainted with the trade in that business and with the people who bought ice; that prior to the acts of defendants complained of he had a good trade in the ice business; that in addition to his city trade he sold ice to country men living in the little towns near Dallas; that he got the biggest part of his ice last season from Armstrong Packing Company and a good deal from Central Ice and Cold Storage Company, till March 1, but that thereafter they would not sell him ice, though he made efforts to get it from them; that during the latter part of February he phoned Mr. Flippen, the secretary of the Armstrong Company, and asked him about getting ice next year, as he thought there was danger about his getting ice, and that Mr. Flippen replied that he would tell him without authority that Mr. Wakefield was going to get Armstrong's ice, and that while the papers were not signed now, yet he could depend on getting ice elsewhere. That Mr. Wakefield was going to get Armstrong's as well as the other three; that he phoned Mr. Armstrong in August about getting ice from him, and he said that he couldn't sell me; that he (Armstrong) had a five years' contract with Mr. Wakefield, and that he didn't have any ice to sell him, Wills, at all; that it was simply Wakefield's ice, and to sell it would simply be selling someone else's ice that did not belong to him, Armstrong; that when he, Armstrong, "pulled" the ice it belonged to Mr. Wakefield and that he had nothing further to do with it when he turned it over to him, Wakefield, and that he, Armstrong, couldn't sell him, Wills, any ice at all. That along about March 1, he, Wills, had a contract with Gardner & Tarver, Earl S. Graham, and T. L. Benning to get ice from them that they had contracted for with the Central Ice and Cold Storage Company. That he got ice through them from Central Ice and Cold Storage Company till the 10th of March, when the Central Ice and Cold Storage Company refused to let him have any more ice; that after this he got his ice from Fort Worth, and had it shipped over the Texas & Pacific and Houston & Texas Central Railroads. That Mr. Jones had made a statement to him about the defendant companies having an agreement; that at the time Jones made the statement he was acting for the Peoples' Ice Company and represented himself to be an officer of the company. That Jones came to his, Wills, place to see him about cutting off ice from the dealers who were getting ice from Wills. That Jones told him that if he would cut them off that he, Wills, could get all the ice he wanted at the Peoples' Company, or that he, Jones, would arrange it so that he, Wills, could get ice anywhere. That Jones offered him $500 to cut off the Oak Cliff wagons and $4,000 to cut off the Dallas wagons without notice, or to ship them in ice that was inferior. That prior to the alleged unlawful acts of defendants, that he, Wills, was making money out of the ice business. That on March 1, 1904, his business had a value; that it was worth $5,000 to $6,000, the way he, Wills, figured it. That on December 1, of this year, 1904, under the present circumstances, his business was not worth anything.

He further testified: "I begun business in March, 1903; I didn't have any ice business at that time, I was in the fuel business; when I

started the business I didn't have any trade; I didn't have any ice business worked up at that time, and it was worth very little in March, 1903. The business gradually grew from the time I started it; I had some mules and wagons when I started; when I first started the whole business was probably worth $800 to $1,100, or something like that; on December 1, 1903, I figured that my ice business was worth $2,000 to $2,500; I am not doing much ice business this winter, but I did more last winter; I have not kept track of the number of pounds of ice I sold last winter, but I sold a great deal of ice compared to what I sold this December. I bought my ice from Armstrong Packing Company and the Central Ice and Cold Storage Company last winter; I ran two wagons last year; I did not sell ice to dealers last year, except to those from the country, who would put it in their wagons and haul it out; I just had two ice wagons running and sold from them; this year, 1904, I ran two wagons to commence with, and then I got another one in July and another one in August; I ran four wagons this year, and two last year; I sold a great deal of ice this year at wholesale, but didn't sell any last year; between December, 1903, and December, 1904, I handled more ice than I did the year previous; I handled a great deal more ice during the year 1904 than I did during the year 1903; I handled a right smart of ice in March, 1904; I commenced the 10th of March, 1904, and handled a car every other day until about the 20th, and then a car every day; that was in March, 1904; I did build up my business and sold four times as much ice as I had ever sold before; I didn't do anything like that in March, 1903, because I had just started then; in March, 1904, I handled nearly a carload a day, but not over a car a day at any time; I thought it was wise to make a contract early for my supply of ice; I did not try to get every bit of the output of the Armstrong Company; he sent for me to come down and wanted me to handle his ice; he didn't say all of it; he said he wanted me to take about twenty-five tons a day; I was not going to take all of his ice that he could spare; I was not going to contract for all I could get from him; I wouldn't sew myself up to take any certain amount. Along about the first of March I had a contract with Gardner & Tarver, Earl S. Graham and with T. L. Benning, to get ice from them that they had contracted for with the Central Ice and Cold Storage Company; I went to the Central Ice and Cold Storage Company after that ice; I went there in March—I commenced, I believe, the first of March, and got ice there the first, second and third of March, and paid Gardner & Tarver for it, and on the 4th of March I saw Mr. Drebelbis, the manager of the Central Ice and Cold Storage Company, and he told me then that they didn't have any ice there to sell to me; that if I got any ice there I would have to buy if from him; that he would be glad to sell me ice, and would sell it to me as long as there was a block in the vaults, and I told him I had already made arrangements with those parties to get part of their ice any time I needed it, and that I didn't see any very good reason why I should change my arrangements with those parties, and he says, "Well, they can't sell any ice to you; they can simply use any ice they get here!" and that was the extent of the conversation, and I said to him that I would not change my arrangements with them; that was on the 5th of March, and I continued to get ice there and had it

charged to Gardner & Tarver and paid them for it whenever I would see them, and took a written order there a time or two signed by them, for blank number of pounds and they would fill it out, I don't know how many times, and had it charged to them, and the 10th morning of March, I went down with Mr. Grigsby and Mr. Trapp who were running a wagon, and had just started up the day before, and I hadn't got any ice on the Texas & Pacific that morning, and I went down and asked Mr. Kiser, their engineer, for some ice, and he says, "No, I can't let you have any," and I told him I had paid Gardner & Tarver and Mr. Benning for it, and wanted it out and he refused to let me have it; the engineer would not let me have the ice; he was the man that had charge of delivering the ice early in the morning before anyone else came down; the time I was there was about three or four o'clock in the morning; he was the night engineer that I speak of. About 11 o'clock on the 17th of last March, I telephoned for number 84 and asked for Mr. Wakefield, and I don't know who answered the phone, but they said he wasn't in and to call his residence, and I called his residence and was not able to talk to him and then I called number 62, the Dallas Ice Factory and asked to speak to their manager, and they said to call the engine room, and give me the number to call, and I called the engine room and they said Mr. Galloway was not there, and then they gave me still another number, the office of the Dallas Ice Factory, and I called that and asked for Mr. Galloway and didn't get him, and I talked to Mr. Herber, who answered the telephone, and asked him if I could get some ice there; then I phoned to Mr. Flippen at the Armstrong Packing Company; then I phoned number 712, that is Wm. J. Lemp's factory, and was referred to number 46, and asked for Mr. Feickert; I talked over the phone to Mr. Feickert and he said, "We have no ice to sell here, you will have to call Mr. Wakefield, he has our ice." That was the extent of the conversation between me and Mr. Wakefield."

F. A. Gillette testified that he was local freight agent of the Houston and Texas Central Railroad Company. That plaintiff, Wills, shipped considerable ice over his road this year, 1904; that he had a conversation with Mr. Jones with reference to his road shipping ice for Wills. That Jones asked him if his road was shipping ice from Fort Worth for Wills. That he told him that it was, and Jones asked him if there was any money in it for handling the ice, and that he asked Jones what he meant. That since he thought about it he believed Mr. Jones did ask him if there wasn't some way by which he could decline to haul the ice, and that he told him no, there wasn't; that they were common carriers and had to haul it. None of the other defendants approached me on that subject at any time.

R. Zink testified that last summer he was running a candy kitchen and ice cream parlor on Ross Avenue and Central Avenue, and that he sold ice; that about the first of March he called up Wakefield over the telephone and talked with him with reference to the price of ice; that Wakefield quoted him price and that he told him, Wakefield, that he could make better arrangements and could get ice from Mr. Wills for 25 cents, and Wakefield answered that he could furnish ice only on those terms, and that he, Zink, replied that he could buy ice from Wills

at 25 cents, and Wakefield said he, Zink, could get it till warm weather came and then he couldn't get it, and then what would he do? That Mr. Wakefield raised the price of ice on his this year as compared with last year.

Joe Bell testified that he was running a store and blacksmith shop at Rylie. That during October he got 1,100 pounds of ice at Lemp's factory for Wills. That he got it in his wagon, not in Wills's wagon. That his wagon was a farm wagon. That when he went after the ice they asked him if he lived in the country. That when he went after the ice he went to the place where he had always gone after ice, and that they would not let him have it there, but sent him up to the office. That when he formerly bought ice from them he never did have to go to the office after it, and that they never asked him before that where he wanted to take the ice.

A. J. Pulaski testified that he lived at Mesquite. That during the summer he was engaged in the ice and meat business. That this season he had got ice from Dallace Ice and Fuel Company, from Lemp and from Mr. Armstrong. That the only question they asked him was where he was doing business at, and that this question was only asked at Dallas Ice and Fuel Company and at Lemp's, but that Mr. Armstrong was acquainted with him, and he presumed knew where he was doing business.

Ed Tarver testified that he was engaged in the retail ice business; that plaintiff, Wills, got ice from him up to March 10, 1904, that during the latter part of February, he, Tarver, asked Mr. Drebelbis, manager of the Central Ice and Cold Storage Company, if he, Drebelbis, would object to his, Tarver's, selling ice to Wills, and he replied that he would not; that Wills got ice there until March 10; that Mr. Drebelbis then told him, Tarver, that they, Gardner & Tarver, could not sell Wills any more ice. He, Drebelbis, said that he, Tarver, could neither buy any ice from Wills nor sell any ice to Wills as he was a competitor of theirs.

W. C. Wills testified that he was a brother of the plaintiff; that he was familiar with plaintiff's business and had worked for plaintiff; that plaintiff's business had a value prior to March 1, 1904; that the value at that time was some thousands of dollars, between $5,000 and $6,000; that he left plaintiff's business in July, and that the value of plaintiff's business had depreciated until it was worth only between $200 and $400 at that time.

George Gardner testified that he was engaged in the ice business; that on the last day of February he and Tarver went down to the Central Company's office and talked with Mr. Drebelbis in regard to his factory allowing Mr. Wills to use their ice through them, Gardner & Tarver; that Mr. Drebelbis said he was perfectly willing for them to let Wills have ice; that this conversation took place about the last day of February, just before the Armstrong contract expired, which was on the first of March; that they, Gardner & Tarver, gave Mr. Wills orders for ice and they were accepted till the morning of March 10, 1904, at which time the Central Ice and Cold Storage Company refused to honor their, Gardner & Tarver's orders in favor if Wills; that the man in charge, Kiser, stated that he had instructions from Drebelbis,

the manager, not to load out Mr. Wills and Mr. Grigsby; that Mr. Grigsby was a man that had been getting ice there under Mr. Wills— one of Mr. Wills' men.

The foregoing, we think, is all the testimony, contained in the record, material to a decision of the question presented and an understanding of our ruling.

In the case of Delz v. Winfree, 80 Texas, 400, our Supreme Court approves the doctrine, that a conspiracy can not be made the subject of a civil action, although damages result, unless something is done which, without the conspiracy, would give a right of action. It is held that the true test as to whether such action will lie is whether the act accomplished after the conspiracy is formed is itself actionable. In that case the following proposition is also conceded to be correct: "A person has an absolute right to refuse to have business relations with any person whomsoever, whether the refusal is based upon reason or is the result of whim, caprice, prejudice or malice, and there is no law which forces a man to part with his title to property." It is said, however, that the latter proposition must be limited to the individual action of the party who asserts the right; that one person, from such motives, may not influence another to do the same thing.

Now, if we should concede, which we do not, that there was sufficient evidence introduced, which would have justified a finding that the conspiracy had been established, still the record will be searched in vain, we think, for any testimony which would have authorized a finding by the jury that appellees, or either of them, did any act, after such conspiracy was formed, which in itself constituted actionable wrong and on account of which appellant was entitled to recover damages. The nearest approach to any evidence tending to show a cause of action for damages, without the conspiracy alleged, is the testimony of Gardner and statement of appellant that he had a contract with Gardner & Tarver to get ice from them that they had contracted for with the Central Ice and Cold Storage Company, and that Mr. Drebelbis, manager of said company, on or about the 4th day of March, 1904, told him that Gardner & Tarver could not sell ice to him, and on the morning of March 10, 1904, refused to let him have ice on the order of Gardner & Tarver, and the testimony of Tarver to the effect that on the evening of the 9th of March, 1904, Mr. Drebelbis told him that the firm of Gardner & Tarver could not sell appellant any more ice; that Drebelbis said that he, Tarver, could neither buy ice from appellant nor sell any ice to him. There is no evidence, however, that Gardner & Tarver or either of them, refused to sell appellant ice, or that he sustained any damage whatever by reason of Drebelbis's statement. Nor does the evidence show that Drebelbis ever attempted in any manner to induce Gardner & Tarver or any one else not to sell ice to appellant, unless his statements to appellant and Tarver referred to can be so construed. But applying the principle recognized in the case of Delz v. Winfree, supra, we think this testimony insufficient to show a cause of action against the Central Ice and Cold Storage Company. It had the right to refuse to sell its ice to appellant, either directly or through Gardner & Tarver, and the mere exercise of that right, no matter what may have been the motive for doing so, whether caprice, malice or prejudice, did not render it liable

to appellant in damages on account of such refusal. As seen in the case cited the assertion of this privilege by the Central Ice and Cold Storage Company could not, legally, be carried beyond its individual action. It did not have the right to influence Gardner & Tarver or any other person to refuse the sale of ice to appellant, and the evidence, as said, fails to show any such attempt on said appellee's part to exercise such influence as amounted to a breach of the privilege mentioned or rule announced. It appears without contradiction that after Drebelbis told appellant that Gardner & Tarver could not sell him ice, the appellee, Central Ice and Cold Storage Company continued to let him have ice through Gardner & Tarver until March 10, 1904, and that prior to March 10, 1904, appellant had contracted to get his ice from Fort Worth, and about 10 o'clock a. m. on that day received from Fort Worth a car of ice containing about fifteen tons. It further appears that in the conversation in which Drebelbis told appellant that Gardner & Tarver could not sell him ice, he stated to appellant that if he got any ice from the Central Ice and Cold Storage Company he would have to buy it from him; that he, Drebelbis, would be glad to sell him ice and would do so as long as there was a block in the vault. Appellant replied to this statement, in effect, that he had made arrangements with Gardner & Tarver to get a part of the ice they had contracted to get from the Central Ice and Cold Storage Company and would make no change, and did not thereafter, so far as the record shows, try to buy any ice directly from that company. Nor does it appear that after the morning of March 10, 1904, he ever attempted to do so through Gardner & Tarver or upon their order and was refused. Again, it is shown beyond controversy that this appellee had no contract whatever with the other appellees in regard to the sale of ice. In reference to the other appellees, C. L. Wakefield, Lemp, the People's Ice Company and the Dallas Ice Factory, Light and Power Company, the evidence fails to show that appellant made any demand upon either of them for the sale to him of any of their ice. The extent of his efforts to get ice from either of these appellees, if it can be said that such was his purpose, will be found in appellant's testimony to the effect that on March 17, 1904, he asked for Mr. Wakefield over telephone No. 84, and was informed by some unknown person to call his residence; that he called his residence and "was not able to talk to him," why, he does not say; that he then called the Dallas Ice Factory, over telephone No. 62, and asked to speak to the manager and was directed to call the engine room, which he did, and they said Mr. Galloway was not there; that after another effort over another telephone to the Dallas Ice Factory he failed to get Mr. Galloway, but that Mr. Herber answered his call and he asked him if he, appellant, could get some ice there, but does not state what reply Mr. Herber made; that he then telephoned Mr. Flippen, of the Armstrong Packing Company, for what purpose he does not say, neither does he say whether or not he reached and talked with Mr. Flippen. That he then telephoned to Wm. J. Lemp's factory and talked to Mr. Feickert, and that Mr. Feickert, said, "We have no ice to sell here; you will have to call Mr. Wakefield, he has our ice." If at any other time or in any other manner during the period covered by the allegations of his petition appellant tried to buy ice from either of said appellees, it is not disclosed by the record.

We think the right of C. L. Wakefield to purchase the ice of his co-appellees as disclosed by the evidence before us can not be doubted. If these contracts of either of them, which were in writing, were in violation of our anti-trust statutes or any other law, there is no evidence of the fact contained in the statement of facts sent to this court. Insofar as the testimony shows these contracts were independent of each other, involved only an ordinary business transaction for the purchase of the ice contracted for, and in no way infringed upon the rights of appellant or any other ice dealer. There is no concerted action or scheme shown, whatever may have been the real facts, on the part of these appellees to injure appellant's business or to destroy or forbid competition in trade. It is true the record shows that appellee Wakefield refused to attach to his deposition copies of these contracts and failed to state the exact terms thereof; and it is argued, in effect, that the withholding of this evidence gives rise to a strong legal presumption of the truth of appellant's allegations. Now, while such conduct may furnish a circumstance tending to show that the terms of the contracts, had they been disclosed, might have affected injuriously the interest of appellees, still it was not of such probative force, either alone or considered together with all the other evidence in the record, as would have authorized a verdict for appellant. It may be that by the failure to produce these contracts and reveal their contents to the court and jury important facts were not disclosed, and the case in that respect and to that extent undeveloped. If, however, any effort was made, further than propounding interrogatories and taking Wakefield's deposition, under the ample provisions of the law to require the production of these instruments or to compel the witness to state their exact contents, instead of his conclusion of their legal effect, it is not shown.

We conclude the evidence adduced was insufficient to sustain the charge of conspiracy or to authorize a recovery against appellees, or either of them, on account of any of the matters alleged, and that the court correctly instructed a verdict in their favor. The rule is that though there be slight testimony, yet "if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the facts sought to be established, it is the duty of the court to instruct a verdict." (Joske v. Irvine, 91 Texas, 574.)

The judgment of the court below is affirmed.

*Affirmed.*