**TEXAS PUBLIC UTILITIES CORPORA-
TION et al. v. EDWARDS et al.**

No. 8262.

Court of Civil Appeals of Texas. Austin.

Nov. 12, 1936.

Motions for Rehearing Overruled Dec.
2, 1936.

Paul D. Page, of Bastrop, and Worsham, Rollins, Burford, Ryburn & Hincks, of Dallas, for appellant Texas Public Utilities Corporation.

Richard Burns, T. D. Anderson, and Andrews, Kelley, Kurth & Campbell, all of Houston, for appellant W. C. Marshall.

Allen Charlton, of Dallas, for appellants E. D. Bordhead, D. J. Haines, and Worth D. Nowlin.

Merton L. Harris and S. L. Staples, both of Austin, C. W. Webb, of Elgin, and James A. King, of Austin, for appellees.

BLAIR, Justice.

Appellees, H. B. Edwards and A. V. Gold, sued Texas Public Utilities Corporation (a corporation manufacturing and selling ice in 26 cities and towns in Texas, including Elgin and Smithville); E. D. Bordhead, its general manager; J. E. Haines, its district

manager; Worth D. Nowlin, its local manager at Smithville; and also sued W. C. Marshall, general manager, and Chester Berry, night superintendent, of the American Service Company, a corporation manufacturing and selling ice in Austin; and others, seeking to recover damages because of certain acts done pursuant to an alleged conspiracy arising in common law and because of certain alleged combinations in restraint of trade in violation of the Anti-trust Laws of Texas (articles 7426 and 7429, R.S.1925), which acts resulted in driving appellees out of the retail ice business in Smithville.

The jury found that only appellants Texas Public Utilities Corporation, E. D. Bordhead, J. E. Haines, Worth D. Nowlin, and W. C. Marshall participated in the conspiracy, which was the proximate cause of appellees' being driven out of the ice business, and that appellees sustained damages in the sum of $31,072, consisting of $3,072 actual damages, $25,000 exemplary damages, and $3,000 attorney's fee. Judgment was accordingly rendered for appellees against said appellants, jointly and severally, for $31,072; hence this appeal.

In the case of State v. Standard Oil Company, 82 S.W.(2d) 402, this court declared the Anti-trust Laws of Texas unconstitutional, and therefore appellants contend that their liability for any damages resulting from the alleged conspiracy must be determined by the rules of common law, and that appellees neither alleged nor proved, as a matter of law, any act done pursuant to the alleged conspiracy which would establish their common-law liability for the resulting damages. A writ of error has been granted by the Supreme Court in the Standard Oil Company Case, but whether the Anti-trust Laws are invalid or not is immaterial, because appellees alleged and proved acts done pursuant to an actionable conspiracy arising in common law, rendering appellants liable for the resulting damages.

Appellant Texas Public Utilities Corporation will be referred to as TPU. The relation of its officers, agents, and employees as above stated is not in dispute, and the same is true of the other above-named corporation. Appellees established their retail ice business in Smithville about June 20, 1933, by renting a lot for $6 per month and placing an ice box or vault on it, their total expenses being about $125. Appellee Gold owned a 1½-ton truck, and the arrangement between him and Edwards was

for him to purchase at wholesale, and truck the ice at night from Austin, and Edwards was to stay at the place of business and sell ice to retail trade; and after paying for the ice and the actual expenses of trucking it, the profits were to be divided equally. Gold had been in a similar business with one Green at Elgin for the two preceding years, but sold his interest to Green for $12.50 just prior to going to Smithville. The Elgin business purchased its ice at wholesale from TPU, but it refused to sell ice at wholesale to appellees at Smithville. The first truck load of ice (about 4,000 or 4,500 pounds) used in the Smithville business was purchased from the American Service Company in Austin, on the night of June 19, 1933, and thereafter a truck load each night until June 30, 1933. On June 20, 1933, Edwards sold about 2,000 pounds of ice to retail trade, and the business increased daily until July 2, 1933, when about 6,400 pounds were sold and about 150 customers had been secured; but at which time the business was closed, because, according to their evidence, appellees could not purchase any more ice at wholesale in Austin or elsewhere in trucking distance of Smithville, due to the acts done by appellants pursuant to the conspiracy, which in substance were as follows:

TPU had no competition in the retail ice business in Smithville prior to the time appellees began their ice business. Appellees paid 25 cents per hundred pounds for their ice at Austin, and sold it for 50 cents at the ice box and 60 cents where delivered to the residence or business of the purchasers in Smithville. These were the prices charged by TPU in Smithville, where it manufactured and sold ice to both wholesale and retail trade, the wholesale price being 20 cents per hundred pounds at the factory. Shortly after appellees established their ice business, Nowlin, the local manager of TPU, notified Bordhead and Haines of such business. Bordhead through Haines ordered Nowlin to put on one day ice sales in Smithville, on June 27 and 30, 1933, cutting the price to 20 cents per hundred pounds for those days, either at the plant or delivered. A similar sale was had on July 2, 1933, which was the last day appellees were in business. TPU sold ice at the usual prices of 50 and 60 cents on Wednesday, Thursday, and Saturday of that week. These one day cut price sales naturally affected the ice business, particularly on the following day, and there was no profit in them for TPU. They were admitted to

have been made as a competitive measure against appellees, it being the view of Bordhead, Haines, and Nowlin that if appellees sold any appreciable amount of ice, there would have been no profit even at the regular prices in the retail business of TPU. Each of the one day ice sales was advertised by hand bills distributed by the agents and employees of TPU in Smithville.

Bordhead and Haines ordered Nowlin and other named employees to find out where the appellees were buying their ice and they accordingly began spying upon appellees; and on the night of June 29, 1933, Haines and one Westmoreland, in separate automobiles, followed Gold's truck to the American Service Company's plant in Austin, and Westmoreland drove his automobile slowly by the plant several times while Gold was loading his ice. Gold called the attention of Berry, the night superintendent, to the automobile, told him that it had been following him, and asked Berry if he knew what it meant. Berry replied that it meant that this was Gold's last load of ice, and that he would likely get his orders to cut him off on the next morning. After appellees closed their business, Berry told Gold that he received such orders on the following morning. After Gold loaded his ice, he went a short distance to a filling station for gasoline, and Westmoreland was there, out of his automobile. He asked Gold for a ride back to Smithville, claiming his automobile was out of repair. Gold accused him of following him and demanded an explanation. Westmoreland denied he was doing so, and went to the automobile of Haines, which was parked nearby. Westmoreland later told Gold he was following him on the night in question, under the instruction of Haines, for the purpose of finding where Gold was getting ice. On the following morning, June 30, 1933, Gold and Edwards went to the office of Marshall, in Austin, and when asked why he refused to sell them any more ice, he replied, according to Edwards, as follows:

"Well, Mr. Marshall said he didn't believe in invading on anybody's territory and he said, 'Why don't you all buy ice from the Texas Public Utility Corporation?' And we told him they wouldn't sell us ice."

Marshall testified that he was afraid if he sold ice for delivery in Smithville in competition with TPU that he would thereby "mess up his own back yard," meaning that TPU would retaliate by selling ice in Austin in competition with the American Service Company, and, in addition, because of certain local conditions, he had sold all the surplus ice he could manufacture to other ice companies in Austin. Marshall testified further that he sold ice both before and after cutting appellees off to several customers at wholesale, and, further, as follows:

"Q. Yes, sir; name somebody else you refused to let have ice? A. I don't recall anyone."

"Q. I am talking about people in Austin. The only man since you have been there is Edwards and Gold that you refused to sell ice for cash there at your business? A. That is all."

In the latter part of June, 1933, Green, who bought ice at wholesale from TPU at Elgin and sold it to retail trade in Elgin, was called to TPU's office and Bordhead and Haines told him that they were going to cut him off from buying ice because they believed he was selling the same ice to appellees to be used in retail trade against TPU in Smithville. Green denied that he was doing so. On this occasion Bordhead told Haines that he heard appellees were going to ship a car load of ice from San Antonio to Smithville, and Bordhead said, "I wish them boys would ship in a car of ice—I would like to see it stand there and melt and run down the track." Green further testified that in this same conversation Bordhead referred to Gold as follows:

"Yes, sir; he said that Gold had invaded his territory three times, and, he said he was getting tired of it, and he seemed to be very sore about the matter. He said he didn't see why he couldn't leave the T. P. U. Company alone and pick on someone else for a while, and he went on to state that they had to protect their business."

In this same conversation Bordhead made a deal with Green to buy his ice box at Giddings, to be placed in Austin, where Bordhead said he was going to ship 50 tons of ice and "give it away if necessary" to stop Austin dealers from selling ice to appellees. Appellees and other witnesses testified to conversations in which Bordhead, Haines, and Nowlin each said that they intended to prevent appellees from making "a dime" or anything in their Smithville ice business.

Appellees testified that several ice manufacturers in Austin refused to sell them ice at wholesale on the day Marshall refused to do so; that they then went to Columbus where they purchased two truck loads of ice, one on June 30th and the other

July 1, 1933, but were told that they could not get any more ice. They further testified that because of the distance and bad condition of the roads at that time to Columbus, they could not make expenses on the ice purchased there and trucked to Smithville; and that on July 2, 1933, they were compelled to close their ice business in Smithville because the acts of appellants prevented them from purchasing ice at wholesale at any point within profitable trucking distance of Smithville.

From the above facts and circumstances the jury could have inferred and found that the appellants named in their verdict participated in and carried out an agreement not to sell ice to appellees at wholesale to be sold in their Smithville retail ice business; that they knew the carrying out of such agreement would completely destroy the ice business of appellees in Smithville; and that the purpose of the agreement was to completely destroy their retail ice business in Smithville. Or, the jury could have inferred and found from the facts and circumstances above detailed that Bordhead, Haines, and Nowlin, acting as individuals as distinguished from their relation to TPU, agreed to and did induce W. C. Marshall not to sell appellees ice at wholesale to be sold by them at retail in Smithville, and that their purpose in so doing was to destroy the retail ice business of appellees in Smithville. Or, the jury could have inferred and found from the facts and circumstances above detailed that Bordhead, Haines, and Nowlin, acting as officers, agents, and employees of TPU, and acting for it, did induce Marshall not to sell appellees ice at wholesale to be sold by them at retail in their Smithville business; that in so doing the TPU was actuated by malice as found by the jury in answer to special issue No. 5; and that the purpose of TPU in so doing was to completely destroy the retail ice business of appellees in Smithville. The jury were also justified in finding that neither Bordhead, Haines, nor Nowlin, in directing their respective subordinates to find out where appellees were securing ice for resale in Smithville, was acting only for the purpose of being able to give one selling ice to appellees the same character of retail competition as such sales to appellees enabled them to carry on in Smithville against TPU.

It is true the evidence of appellees was circumstantial in many respects, but the rule is settled that a conspiracy may be proved either by direct or circumstantial evidence, and that in the very nature of things it must ordinarily be proved by circumstantial evidence. A conspiracy may also be proved by the acts of the conspirators as well as by declarations that they have made touching their intended or accomplished designs. Blackwell v. Ship Channel Development Co. (Tex.Civ.App.) 264 S.W. 223; Rowley v. Braly (Tex.Civ. App.) 286 S.W. 241; Whitmore v. Allen, 33 Tex. 355. The facts alleged, proved, and found by the jury establish what is termed an "actionable conspiracy" arising in common law, which was defined by the Supreme Court in granting the writ of error in Griffin v. Palatine Ins. Co., 235 S.W. 202, 205; Id. (Tex.Com.App.) 238 S.W. 637, as follows:

"A man may lawfully refuse to have business relations with another for any reason —on account of whim, caprice, prejudice or ill will. He may lawfully induce others to refrain from having business relations with such third person, though it injuriously affects such person, provided his action be to serve some legitimate interest of his own, as reducing the competition of such third person's business, and no definite legal rights of the latter, such as contract rights, are thereby violated. He cannot lawfully, however, go beyond this in inducing other persons to refrain from business relations with a third person, since his purpose in such event would not be for his own protection, but for another's injury, and would necessarily amount to a malicious or wanton interference with another's business. In such cases, therefore, the motive must determine the lawfulness of the act."

By the language used in a number of decisions in this state, the rule is laid down broadly that an act lawful when committed by one person is lawful when committed by several persons in pursuance of an agreement, and that this is so even though they may have acted with a malicious motive. Olive v. Van Patten, 7 Tex. Civ.App. 630, 25 S.W. 428; Delz v. Winfree, 6 Tex.Civ.App. 11, 25 S.W. 50; Wills v. Central. Ice, etc., Co., 39 Tex.Civ.App. 483, 88 S.W. 265. But as pointed out in the Griffin Case, this is not true where the proof shows that there was an agreement between two or more persons not to have business relations with a person and to induce others not to have dealings with him, because such acts establish actionable wrong, the purpose being shown to have been malicious or without justification in law. In such cases it has been declared that a combination

to destroy or injure the business of a third person is in itself unlawful where there is no legal justification. Brown v. American Freehold Land Mortg. Co., 97 Tex. 599, 80 S.W. 985, 67 L.R.A. 195; North Texas Gin Co. v. Thomas (Tex.Civ.App.) 277 S.W. 438. And according to this view, it is not necessary that others should have been actively persuaded not to do business with the injured person. Griffin v. Palatine Ins. Co., supra. And while it is true that a person has the absolute right to refuse to have business relations with any other person for any reason whatsoever, the privilege must 'be limited to the individual, and he may not with impunity influence another person, whether a party to the conspiracy or not, to refrain from business relations with such person, without being guilty of an actionable wrong. Delz v. Winfree, 80 Tex. 400, 16 S.W. 111, 26 Am.St.Rep. 755. This is in accordance with the weight of authority, "to the effect that while the act of an individual may not give rise to civil liability, yet the same act committed by several acting in concert may be unlawful and constitute an actionable wrong." 12 C.J. 583. The test for determining whether the lawfulness of a combination to commit an act, which if committed by an individual would not subject him to civil liability, is the motive inspiring the combination, or the nature of the object to be attained as a consequence of the act. That is, "such combinations are actionable conspiracies, although the acts when done by an individual would not subject him to civil liability, when the acts are done with malice, that is, with the intention to injure another without just cause or excuse, or where the natural and necessary consequences of the act, although done to benefit the conspirators, is the * * * oppression of individuals. Intentionally to do that which is calculated in the ordinary course of events to damage another in his property or trade is, when done without just cause or excuse, what the law calls an actionable wrong. Just cause or excuse exists only where the injury inflicted is the means to some end legitimately desired and incidental thereto, and is not the result of a specific intent and immediate purpose of injury to others that benefit may ultimately come to the members of the combination. It is entirely wanting when the immediate purpose of the combination is to inflict injury on others, and the benefit, if any, to result to the combination, is indirect and remote. An agreement entered into for the primary purpose of injuring another is not rendered legal by the fact that it may incidentally benefit the parties." 12 C.J. 584.

█ We do not wish to be understood as holding that the mere putting on of ice sales at reduced prices by TPU or its agents and employees in Smithville would amount to an actionable conspiracy, because such acts would be considered as legitimate competition; but such acts are admissible as tending to show the motive of the parties in carrying out an agreement to not sell and to induce others not to sell ice at wholesale to appellees. Nor do we hold that the mere act of Marshall in refusing to sell appellees ice, standing alone, would amount to an actionable conspiracy. Brown v. Mortg. Co., 97 Tex. 599, 80 S.W. 985, 67 L.R.A. 195; North Texas Gin Co. v. Thomas (Tex.Civ. App.) 277 S.W. 438.

In answer to special issue No. 3 the jury found that the acts done by appellants pursuant to the conspiracy were the proximate cause of appellees' being driven out of the retail ice business in Smithville. As a part of this issue, the court instructed the jury as follows:

"In this connection you are charged that the term 'proximate cause', as used in this Charge, is that cause which in natural and continuous sequences, unbroken by any efficient, intervening cause, produces the result complained of, and without which that result would not have occurred, and in the light of the attending circumstances such result ought to have been foreseen by a person of ordinary care and prudence."

█ Appellants objected to this instruction or definition because it failed to define the term "efficient intervening cause," as used in the charge of the court. The court overruled the objection. This was clearly reversible error. The evidence in this connection would support a jury finding that the ice dealer at Columbus, acting independently of the appellants and without any request from them, stopped selling ice to appellees while their business was still making profits; that up to that time the refusal of Marshall to sell appellees ice did not prevent them from securing ice; that the refusal of the Columbus dealer to sell them ice was the sole proximate cause of appellees quitting business; and that the act of the Columbus dealer in refusing to sell appellees ice was an independent cause that appellants could not reasonably foresee and anticipate as concurring with their respec-

tive acts done pursuant to the conspiracy to destroy the ice business of appellees in Smithville.

■ The rule is settled that where the evidence raised the issue of "new and independent cause" or an "efficient intervening cause," it is reversible error not to define such terms as used in court charges upon written request of the party interested to do so. Greer v. Thaman (Tex.Com.App.) 55 S.W.(2d) 519; Robertson & Mueller v. Holden (Tex.Com.App.) 1 S.W.(2d) 570; Schwarz v. Sprinkle (Tex.Civ.App.) 55 S.W.(2d) 590.

■ In this connection appellees contend that the refusal of the Columbus dealer to sell them ice was not an "efficient intervening cause," because the undisputed evidence showed as a matter of law that the distance from Columbus to Smithville and the condition of the roads at the time rendered it unprofitable for appellees to purchase ice at Columbus; and that therefore the error in refusing to define the term "efficient intervening cause" was not error, or was harmless error. This contention is not sustained because the evidence is sharply conflicting on the issue. That is, appellants' testimony on the issue showed that the distance from Smithville to Columbus was only 3 or 4 miles farther than the distance to Austin from Smithville, and that the Columbus roads were as good if not better than the Austin roads. On the other hand, appellees' testimony showed the distance from Smithville to Columbus to be some 12 or 15 miles farther than to Austin, and that the Columbus roads were under reconstruction, necessitating detours over bad roads at the time in question. This conflict in evidence presented a jury question on the issue of new and independent cause or "efficient intervening cause."

■ The trial court also erred in refusing to submit to the jury, upon the written request of appellants to do so, their three separate and independent defenses, as follows:

1. That appellees voluntarily abandoned their business while they were able to secure ice from Columbus and not because of the fact that they had been refused ice by Marshall or the American Service Company.

. 2. That the sole proximate cause of the appellees quitting the retail ice business in Smithville was the independent and legal acts of TPU in making one day cut price sales of ice in Smithville, and being the result of competition considered legitimate.

3. That the acts of the Columbus ice dealer, acting independently of appellants and without any request from them, and while appellees' business was still profitable, in refusing to sell appellees ice was the sole proximate cause of their quitting the ice business in Smithville.

These defenses were pleaded by appellants and the above detailed evidence raised such issues or defenses.

"It is settled law in Texas that each party has the right to have all of the material ultimate issues of fact made by its pleadings and proof submitted to the jury, and, in the event of the court's failure to do so, the complaining party may, by objections properly filed, call the court's attention to the omission, or present special issues with the request that they be submitted to the jury. He is not required to do both, and should the trial judge fail to correct his charge or to submit the special issues requested, there is sufficient ground upon which to base an assignment of error." Ferguson Seed Farms v. Ft. Worth & D. Ry. Co. (Tex.Civ. App.) 69 S.W.(2d) 223, 227; Greer v. Thaman (Tex.Com.App.) 55 S.W.(2d) 519; Richards v. Westmoreland (Tex.Civ.App.) 63 S.W.(2d) 715, 716; and cases therein cited.

■ For the same reasons, the trial court erred in refusing to submit to the jury whether appellant Marshall acted independently of the other defendants in refusing to sell appellees ice at wholesale to be resold by them in Smithville, and whether in refusing to sell appellees ice Marshall acted solely for the protection and benefit of the American Service Company. These special defenses were properly pleaded by Marshall and raised by the evidence, and he seasonably and properly requested the court to submit such special defenses to the jury.

■ The trial court also erred in overruling the special exception to the portion of appellees' petition which alleged in substance that "particularly" the TPU was a very strong business concern with large holdings in property and money in Smithville and throughout Texas, and that appellees were very poor men, with small capital and without credit or resources; that TPU and its officers and agents knew of this condition and took advantage of same by conspiring to and in carrying out one day cut price sales of ice in Smithville for

the purpose of destroying appellees' retail ice business in Smithville. The relative financial strength of the parties in connection with the cutting of the price of ice as a competitive measure against the ice business of appellees had no legal significance and was inflammatory and calculated to enlist the sympathy of the jury for appellees. No issue was submitted to the jury covering the relative financial strength of the parties and none should have been submitted. Manifestly, if a person is financially able to destroy a competitor by cutting prices of a commodity sold, the respective wealth of the parties is immaterial. The gravamen of the offense or wrong would seem to be in conspiring to use price cutting as a means of purposely injuring or destroying the business of another person, and not as a legitimate means of competition. North Texas Gin Co. v. Thomas, supra.

In this connection the argument of counsel for appellees, calling attention of the jury to the relative financial condition of the TPU and appellees, and insisting that the jury should assess large exemplary damages because TPU was able to pay them, was improper. This is true even though there was some evidence in the record as to the financial condition of said parties, but which evidence related to other issues in the case. Hewitt v. Buchanan (Tex.Civ.App.) 4 S.W.(2d) 169; Southern-Harlan Coal Co. v. Gallaier, 240 Ky. 106, 41 S.W.(2d) 661; Lamar Life Ins. Co. v. Bauer (Tex.Civ.App.) 70 S.W.(2d) 600. No doubt this argument of able counsel greatly influenced the jury in assessing the large and excessive sum of $25,000 as exemplary damages. It is not permissible in Texas to consider the financial worth of the defendant in fixing the amount of exemplary damages. · Willis & Bro. v. McNeill, 57 Tex. 465; Hudson Ins. Co. v. McKnight (Tex.Civ.App.) 58 S.W.(2d) 1088. In some jurisdictions the question of the relative wealth of the parties may be considered in assessing exemplary damages, and counsel insist that the argument was proper under that rule. But such is not the rule in Texas, as is pointed out in the last above-cited cases, and it has many limitations as applied in other states.

Since we are reversing the case upon other grounds, the question of the excessiveness of the exemplary damages need not be further discussed. On another trial, where the issue is properly presented, excessive exemplary damages may not be assessed by the jury.

Attention is called, however, to the fact that there was no jury finding that any particular appellant, except TPU, acted with malice in doing the acts pursuant to the conspiracy. In order that a recovery of exemplary damages may be sustained in an action for conspiracy, the plaintiff must show that each defendant against whom exemplary damages is assessed was actuated by malice in doing the acts complained of in pursuance of the conspiracy.

Attention is also directed to the fact that special issue No. 5, submitting to the jury the question of whether TPU maliciously induced Marshall and Berry, or either of them, not to sell ice to appellees, and with instruction to answer the issue "Yes" or "No," was multifarious. From the answer "Yes," it could not be told whether the jury found that Marshall was induced to refuse to sell ice, or whether Berry was induced to refuse to sell appellees ice. There was no evidence that Berry refused to sell ice to appellees. Oil Well Supply Co. v. Jowell (Tex.Civ.App.) 48 S.W.(2d) 406; Weidmer v. Stott (Tex.Civ.App.) 48 S.W.(2d) 389.

Attention is also called to the fact that the issue as to the amount of exemplary damages was submitted separately from the issue as to the amount of attorney's fee. Such fee could only be recovered as a part of the exemplary damages, and the failure of the court to so instruct the jury was error. 13 Tex.Jur. 196, 197.

We do not deem it necessary to discuss the propositions presented with regard to the method used in summoning and selecting additional jurors to try this case, or whether there was error in the manner in which the trial court communicated with the jury during their deliberations, because such matters are not likely to occur on another trial.

We overrule the propositions of appellants attacking the sufficiency of the pleadings of appellees to allege an actionable conspiracy.

Under our above conclusion that an actionable conspiracy arising in common law was alleged and proved, we overrule the propositions of appellants that the acts alleged and proved as having been done pursuant to the alleged conspiracy were insufficient, as a matter of law, to show that such acts were the proximate cause of the injuries resulting to appellees.

We also overrule the propositions of appellants that there was no prop-

er basis proved for actual damages, and that probable future profits in the ice business of appellees could not be considered by the jury in assessing actual damages.

We do not deem it necessary to discuss appellants' several remaining propositions relating to other asserted improper arguments of counsel for appellees to the jury. Such arguments need not occur on another trial. Nor do we deem it necessary to discuss numerous other propositions relating to questions of practice, in not embodying each independent defense raised by the pleading and evidence in the main charge of the court. In view of our above holdings that such defenses should have been submitted, the court on another trial will no doubt include them in his main charge.

The trial court's judgment is reversed and the cause remanded.

Reversed and remanded.