## STATE v. STANDARD OIL CO. et al.

### No. 8084.

Court of Civil Appeals of Texas. Austin.
April 3, 1935.

Rehearing Denied May 1, 1935.

James V. Allred, Atty. Gen., Everett L. Looney and H. D. Bishop, Asst. Attys. Gen., and Bryan Blalock, Co. Atty., Cofer & Cofer, and George Mendell, all of Austin, for the State.

Andrews, Kelley, Kurth & Campbell, of Houston, for appellee Standard Oil Co.

Williams, Neethe & Williams, of Galveston, for appellee Socony-Vacuum Corporation.

Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., and W. A. Keeling, of Austin, for appellees Shell Union Oil Corporation and Shell Petroleum Corporation.

E. E. Townes, Hines H. Baker, and Frank Andrews, all of Houston, and Ben H. Powell and T. H. McGregor, both of Austin, for appellee Humble Oil & Refining Co.

H. T. Klein, of New York City, W. O. Crain and Wm. K. Hall, both of Houston, and Black & Graves, of Austin, for appellee Texas Co.

James J. Cosgrove, of New York City, and Burney Braly, of Fort Worth, for appellee Continental Oil Co.

R. T. Osborn, of New York City, V. R. Tomlinson, of Fort Worth, C. R. Wharton, of Houston, Cantey, Hanger & McMahon, of Fort Worth, Homer L. Bruce, of Houston, and Alfred McKnight, of Fort Worth, for appellee Sinclair Refining Co.

W. H. Francis, A. S. Hardwicke, and Walace Hawkins, all of Dallas, and Dan Moody, of Austin, for appellee Magnolia Petroleum Co.

Thompson, Knight, Baker & Harris, of Dallas, for appellee Simms Oil Co.

Phillips, Trammell, Chizum, Estes & Edwards, of Fort Worth, for appellee Cities Service Oil Co.

John Hancock, Clarence Wightman and Eugene T. Adair, all of Fort Worth, for appellee Texas Pacific Coal & Oil Co.

Henry Brooks and Polk Shelton, both of Austin, for appellee Texas Petroleum Marketers' Ass'n.

Weeks, Morrow & Francis, of Wichita Falls, for appellee American Petroleum Institute.

Wm. H. Burges, of El Paso, and Charles L. Black, of Austin, for appellees Standard Oil Co. of California and Pasotex Petroleum Co.

R. L. Batts, of Austin, Claude McCaleb, E. A. Berry, and David Proctor, all of Houston, P. O. Settle, of Fort Worth, and Jno. E. Green, Jr., of Houston, for appellee Gulf Refining Co.

BAUGH, Justice.

Appeal is from the order of the trial court sustaining a general demurrer to the state's petition in a suit against appellees, charging them with violation of the antitrust laws of the state of Texas, and seeking to enforce against them the penalties authorized by the civil statutes.

The original petition was filed on November 12, 1931. The demurrer was sustained to the third amended original petition on

October 3, 1933. The conspiracy alleged was through the formulation, adoption, and execution, by the several defendants, for the purposes and in the manner charged, of what was designated as a "Code of Practices for the Marketing of Refined Petroleum Products" (hereafter referred to as the code) in 1928 and 1929, operative throughout the United States, and particularly in the state of Texas. It was charged by the state that said code was designed to circumvent the anti-trust laws; that an approval thereof by the Federal Trade Commission was obtained in February, 1929; that in furtherance of such general conspiracy, and after meetings of representatives of defendants in Texas, such code was put into operation in this state in November, 1929. All of the defendants were alleged to have been parties to the conspiracy. Four nonresident corporations which had no permits to do business in Texas were sued and attachments issued against them as follows: The Standard Oil Company, on the ground that it was a party to the alleged conspiracy, and owned the controlling stock of the defendant Humble Oil Company, a Texas corporation. The same grounds were alleged against the Socony-Vacuum Corporation, as owner of the controlling stock of the defendant Magnolia Petroleum Company; the Standard Oil Company of California, as owner of the controlling stock of the defendant Pasotex Petroleum Company; and the Shell Union Corporation, as owner of the controlling stock of the defendant Shell Petroleum Corporation. The American Petroleum Institute was charged with instituting, effecting, and assisting in carrying out the alleged conspiracy; and the Texas Petroleum Marketers' Association, a Texas corporation, was charged with co-operating and assisting in carrying out the alleged conspiracy in the state. The other defendants are major oil companies chartered under Texas laws, or having a permit to do business in the state. In addition to penalties sought, the state prayed that the several charters of the defendants be forfeited, or, as against nonresident corporations, that their permits to do business in the state be canceled.

While it is stated in the state's brief that the ground upon which the trial court sustained the general demurrer was that the Act of Congress of June 16, 1933, known as the National Industrial Recovery Act (48 Stat. 195), operated to suspend, during the life of said act, the anti-trust laws of Tex-

as, in so far as the matters charged against the defendants are concerned, the order of the court does not so state. Whether that be true or not, if as a matter of law the action of the trial court were correct, it is not material whether such action be based upon an improper ground, if in fact the ground stated were proper.

As sustaining the action of the trial court, appellees urge, amongst other things, that such action was proper upon three grounds: First, that the provisions of said code, when given a reasonable construction and application, in the light of existing laws and decisions, both state and federal, does not violate the provisions of the anti-trust laws of Texas. Second, that the National Industrial Recovery Act, not attacked by the state, does in effect suspend or supersede the state anti-trust laws. Third, if it be conceded that neither of the foregoing positions is tenable, that the anti-trust laws of the state, as they now appear in the Revised Statutes of Texas, are, under the decisions of the Supreme Court of the United States, clearly unconstitutional.

The code in question consists of twenty-one rules relating for the most part to the sale of petroleum products through what is commonly known as filling stations. Other than as to the acquisition by said refineries, wholesalers, and jobbers of such retailing agencies, the loaning of equipment, and the posting of prices, these rules appear to have been designed to prevent unfair competition and secret rebates made illegal by article 1638, Rev. Penal Code 1925, which is a part of the anti-trust laws. Most of said rules bear a reasonable relation to, and are obviously intended to prevent, the practices prohibited by said article of the statute. Rule 7 authorizing the acquisition by appellees of filling stations, and rule 17 relating to the posting at such stations of prices of petroleum products, and inhibiting any deviation by such retailers from such posted prices, do not, we think, on their face constitute a violation of the anti-trust laws. However, the allegations of the state as to the purposes underlying the formation of said code, the manner and method used by the defendants under its protection, in gaining control of numerous filling station agencies throughout the state for the purpose and with the result of eliminating competition, and the alleged agreement between defendants in connection with the posting and maintaining of fixed and identical prices at all such filling stations for

the purpose and with the result of establishing fixed prices agreed upon in advance for all of such products throughout the state, were clearly sufficient, we think, to charge a combination restraining competition and a price-fixing set-up in violation of the anti-trust laws of the state.

Since, however, we have concluded that the anti-trust laws, as now embodied in the Revised Statutes of Texas, must be held to be unconstitutional, we deem it unnecessary to enter upon a discussion of the sufficiency of the pleadings with respect to the agreements and illegal combinations charged. For like reason the rules of the code itself, and their various provisions and application to said industry, need not be considered in detail.

Texas was one of the pioneer states in anti-trust legislation. The first act on the subject by the Texas Legislature was approved March 30, 1889, more than a year before the passage by the Congress of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note). Acts 21st Leg. (1889) p. 141. It defined and made unlawful trusts and combinations in restraint of trade, provided for forfeiture of charter of domestic corporations violating said act, canceling of permits of foreign corporations for such violations, prescribed fines and imprisonment in the penitentiary of those convicted of such violations. Section 13 of said act provided: "The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser." The Revised Statutes of 1895 embodied the material provisions of said original act with amendments and the exemptions from its operation of agricultural products and live stock were contained in both the Civil Statutes and the Penal Code of 1895, with the additional exemption in the civil statutes of labor organizations. In 1899 three acts were passed relating to the anti-trust laws, being Senate Bill 323, Acts 26th Leg., c. 146, p. 246; H. B. 97, Acts 26th Leg. c. 153, p. 262; and H. B. 845, Acts 26th Leg. c. 172, p. 310, S. B. 323, approved May 25, 1899, enlarged and extended the provisions of the anti-trust laws then in force, and was cumulative. In it, for the first time, the Legislature took cognizance of what has come to be known as "cut-throat competition" and made it unlawful to sell below cost or to give away products for the purpose of driving out competition, or intentionally injuring competitors engaged in a similar business. H. B. 97, approved May 27, 1899, enlarged and extended the exemptions of labor or trades unions from the operation of the anti-trust laws then in force. H. B. 845, approved June 5, 1899, amended article 5318, R. S. 1895, by increasing the penalties for violations therein provided.

In 1903, the anti-trust laws were rewritten, defining trusts, monopolies, and conspiracies in restraint of trade, and providing penalties for violation of the laws prohibiting same. Acts 28th Leg. c. 94, p. 119. This latter act expressly repealed the anti-trust provisions of the Revised Civil Statutes and of the Penal Code of 1895, and S. B. 323 and H. B. 845 of the 26th Legislature, passed in 1899, but no mention is made of H. B. 97, enacted in 1899, exempting labor unions from the provisions of said anti-trust laws. The act of 1903 recited in the emergency clause as a reason for its enactment, "The fact that the anti-trust laws enacted by the Legislature of the State of Texas in 1895 have been held to be unconstitutional." This act was approved March 31, 1903. On March 10, 1902, the Supreme Court of the United States, in Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 440, 46 L. Ed. 679, had held the anti-trust laws of the state of Illinois unconstitutional as repugnant to the Fourteenth Amendment of the Constitution of the United States with respect to equal protection of the laws, because the Illinois anti-trust act (Hurd's Rev. St. Ill. 1899, c. 38, § 269s, p. 618) contained an exemption from the provisions of said laws, "agricultural products or live stock while in the hands of the producer or raiser," being the identical language of the Texas statutes. This case was followed by the Supreme Court of Texas in State v. Shippers' Compress & Warehouse Co., 95 Tex. 603, 69 S. W. 58, decided June 19, 1902. Undoubtedly these cases occasioned the legislative act of 1903. In 1907 the act of 1903 was variously amended and supplemented, but none of said acts provided for any exemptions from the provisions of said anti-trust laws. See Acts of the Regular Session 30th Leg., c. 12, p. 16, c. 97, p. 194, c. 120, p. 221, and First Called Sess., c. 10, p. 456. None of these acts of 1907 appears to have any material bearing upon the issue under consideration here. It may be noted, however, that in the Acts of the First Called Sess. of the 30th Leg., p. 456, c. 10, cognizance was again taken by the Legislature of "cut-throat competition," and practices of

selling below cost, giving secret rebates, or giving away products for the purpose and with the intent of driving out competition or financially injuring competitors in a similar business, were brought within the purview of the anti-trust laws themselves and made a felony.

In 1911 the statutes, both civil and criminal, were again revised. The anti-trust laws in the Revised Civil Statutes, title 130, arts. 7796 to 7809, R. S. 1911, were taken almost entirely from the act of 1903. This title provides no exemptions. Chapter 2 of said title (articles 7810 to 7818) relates entirely to procedural matters and embodies the act of 1907 on that subject. Chapter 2 of title 77 of the 1911 Revision was taken from the act of 1899, exempting labor unions from the anti-trust laws, which 1899 act was not expressly repealed in the 1903 act. Articles 5244 to 5246, R. S. 1911. In the final title, however, of the 1911 Revised Civil Statutes, section 16 provided: "That the provisions of the Revised Statutes, so far as they are substantially the same as the statutes of this state in force at the time when the Revised Statutes shall go into effect, or of the common law in force in this state at said time, shall be construed as continuations thereof, and not as new enactments of the same."

This provision appears to negative any intent on the part of the Legislature to repeal all pre-existing laws and so make the Revised Statutes of 1911 the whole body of the law regardless of all laws theretofore in force, except the civil statutes of a general nature not included therein. See section 4 of said final title: These Revised Civil Statutes were to take effect at noon on September 1, 1911.

The anti-trust statutes carried into the Penal Code of 1911 are found in title 18, c. 6, arts. 1454 to 1479. Articles 1454, 1455, 1456, 1457, 1458, 1460, 1461, 1462, 1463, 1465, 1468, and 1469, P. C. 1911, are identically the same, respectively, as articles 7796, 7797, 7798, 7799, 7800, 7802, 7803, 7804, 7805, 7807, 7810, and 7808 of the Revised Civil Statutes of 1911. Articles 1459, 1464, and 1474 of the P. C. are substantially the same as articles 7801, 7806, and 7809 of the Revised Civil Statutes of 1911. All of said articles except 1468 and 1474, P. C., and their counterparts, 7810 and 7809, R. C. S., are taken from the anti-trust act of 1903, the last-named articles being taken from the acts of 1907. In addition to the foregoing articles of the Penal Code of 1911, other articles not appearing in the Revised Civil Statutes occur, taken for the most part from the act of 1907, making the violation of the anti-trust laws a felony and prescribing the punishment at confinement in the penitentiary. There were also added as articles 1477, 1478, and 1479, provisions containing the exact language of H. B. 97, above referred to, enacted by the 26th Legislature (Acts 1899, p. 262), which had not been specifically repealed by the act of 1903. Not only was this done, but the first clause of article 1477, P. C. 1911, provided that, "The provisions of this law shall not apply to agricultural products or live stock while in the hands of the producer or raiser. * * *" It will thus be seen that in enacting the Penal Code of 1911, the Legislature not only inserted the labor exemption of the 1899 act, but re-enacted in addition thereto the exemption of farmers and stock raisers contained in the original anti-trust act of 1889 and in the R. S. of 1895, both of which had been expressly repealed by the act of 1903.

The state earnestly urges that the inclusion of said exemptions by the Legislature in the Penal Code of 1911 was done through inadvertence or mistake; and that the Legislature should not be held to have intentionally included in the Penal Code exemptions which would render the law unconstitutional. However plausible such a contention may be, we cannot escape the conclusion that the exemptions were enacted advisedly. If only the exemption as to labor had been included by bringing forward in the 1911 revision the act of 1899 which had not been expressly repealed, such contention might be sustained. But the fact that, in addition thereto, the Legislature went back to the acts of 1895 and 1889, and again inserted the exemption of farmers and stock raisers, compels the conclusion, we think, that it did so advisedly and intentionally.

However, if it be conceded that such exemptions were inadvertently placed in the Penal Code of 1911, the same exemptions occur in article 1642 of the Revised Penal Code of 1925. The state further contends that having been incorporated by inadvertence in the R. S. of 1911, the exemption was again inadvertently and unintentionally carried forward into the Penal Code of 1925. With this we cannot agree.

The act providing for the revision of statutes adopted in 1925 was approved March 30, 1923 (Acts 38th Leg. Reg. Sess.,

c. 159, p. 338). This act provided that the commissioners to be appointed by the Governor should possess the qualifications of the judges of the Supreme Court, and both authorized and directed them to rewrite, change, modify, and clarify the entire body of the law, omit obsolete and unconstitutional statutes, and so rewrite or change the statutes as to make them harmonious, plain, concise, and complete. The report of the commissioners to the Legislature, in submitting the draft of the Revised Statutes, indicates a careful and painstaking effort to carry out the purposes of said act. And in adopting the Revised Statutes of 1925, both civil and criminal, the Legislature manifested a clear intent, not to merely adopt the recommendations of the commission, nor to continue in force former laws passed, but to make said statute a distinct act of the Legislature constituting the laws of the state, except as therein otherwise expressly provided, none of which exceptions related to the anti-trust laws. In section 2 of the final title of the Revised Civil Statutes (1925) it was provided: "That all, civil statutes of a general nature, in force when the Revised Statutes take effect, and which are not included herein, or which are not hereby expressly continued in force, are hereby repealed." The provision of section 16 of the final title of the R. C. S. of 1911 provided exactly the contrary. And in section 22 of Rev. St. 1925: "That these Revised Statutes when adopted shall be construed to be an Act of the Legislature." And in the general repealing clause, constituting section 3 of the Revised Penal Code and Code of Criminal Procedure, it was provided: "Be it further enacted by the Legislature of the State of Texas: That all penal laws and all laws relating to criminal procedure in this State, that are not embraced in this Act and that have not been enacted during the present session of the Legislature, be and the same are hereby repealed. All laws and parts of laws relating to crime omitted from this Act have been intentionally omitted, and all additions have been intentionally added, and this Act shall be construed to be an independent Act of the Legislature enacted under the caption hereof, and the articles contained in this Act, as revised, re-written, changed, combined and codified shall not be construed as a continuation of former laws, except as otherwise herein provided." (Article 1.)

All of said statutes, both civil and criminal, were made effective at noon September 1, 1925. In the Revised Civil Statutes of 1925, arts. 7426, 7427, 7428, and 7429, defining trusts, monopolies, and conspiracies against trade and making same illegal, are identical with articles 7796, 7797, 7798, and 7799 of the R. C. S. of 1911. Subsequent articles of the 1911 R. C. S. were, however, modified, changed, rewritten, or clarified, showing a careful consideration thereof by the Legislature; article 7805 of 1911 revision being entirely omitted from the 1925 revision. Article 7806 of the 1911 revision providing for penalties of from $50 to $1,500 per day for violation of said anti-trust laws was re-written, but carried forward substantially the same in article 7436 in the 1925 revision. The anti-trust title of the 1925 R. C. S. contains no exemptions.

The anti-trust laws contained in the Penal Code of 1925 comprise articles 1632 to 1644. Articles 1632 to 1635 are identical with articles 7426 to 7429, R. C. S. 1925, and with articles 1454 to 1457 of the Penal Code of 1911. The remaining articles of the Penal Code of 1925, relating to trusts, etc., show a careful rewriting, rearrangement, and clarification of the provisions of the Penal Code of 1911 relating thereto, and numerous omissions of matters contained in the 1911 revision. Likewise the procedural provisions both in the 1911 P. C. and in the 1925 R. C. S. are materially changed, redrawn, and revised in the Penal Code of 1925. Articles 1642–1644 of the Penal Code of 1925 contain the same exemptions from the provisions of the anti-trust laws as to farmers, stock raisers, and labor, as did articles 1477–1479 of the Penal Code of 1911. Articles 1642 and 1643 of the 1925 revision, however, show a careful rewriting and revision of the old articles 1477 and 1478 of the Penal Code of 1911.

In view of this history of said statutes, the recitals above quoted from the Revised Statutes of 1925 themselves, the fact that said exemptions occurred in the Penal Code of 1911, and remained therein through many sessions of the Legislature prior to 1925 without repeal or amendment, and were then again carefully rewritten into the Penal Code of 1925, and have continuously remained there since that date without material change, conclusively show, we think, that the exemptions were placed there advisedly, deliberately, and intentionally by the Legislature and that they constitute an integral part of the anti-trust laws of the state.

The Penal Code of 1925 and the Revised Civil Statutes of 1925 were enacted at the same session of the Legislature and were made effective at exactly the same time. The definitions of trusts, monopolies, and restraints of trade, and the provisions making them illegal, are identical in both the Penal Code and the Civil Statutes. Numerous other provisions, both definitive and procedural of the anti-trust laws, common to both the criminal and civil statutes, are substantially the same either in language or effect or in both. Clearly both acts deal with the same subject-matter, and are in pari materia and must be construed together as though they constituted one act. Southern Pac. Co. v. Sorey, 104 Tex. 476, 140 S. W. 334; McGrady v. Terrell, 98 Tex. 427, 84 S. W. 641; J. I. Case, Threshing Machine Co. v. Howth, 116 Tex. 434, 439; Lowery v. English (Tex. Civ. App., writ ref.) 299 S. W. 478; Lovett v. Simmons (Tex. Com. App.) 29 S.W.(2d) 1021, 1022; 59 C. J. 1053, and numerous cases there cited. These exemptions contained in the Penal Code, but not in the Civil Statutes, do not create nor constitute any conflict between the two, any more so than do the different provisions in the Penal Code and the Civil Statutes for different penalties for violations of the respective statutes. Though enforceable in the one instance by criminal prosecution and in the other by civil suit, the penalties provided in either case are essentially criminal in character, enforceable in either case at the instance of the state and for the benefit of the state, or for the protection of the public. The offense in either case is essentially one against sovereignty. There being no conflict nor ambiguity in the provisions of the respective statutes, and no occasion to look to the former acts of the Legislature on the subject for interpretation or explanation, the Revised Statutes of 1925 become the entire law on the subjects they purport to cover. As stated by Chief Justice Cureton, in American Indemnity Co. v. City of Austin, 112 Tex. 239, 246 S. W. 1019, 1025: "But the Revised Statutes, as we have seen, are the law, and are to be looked to with safety and confidence by the citizen; nor need one, under the rules of construction shown in the authorities cited, look into the original acts, except to explain ambiguities in the Code. The Revised Statutes of this state, when once adopted, become the entire law on the subjects they purport to cover, unless specially excepted, and any inquiry into matters of legislative procedure by which the original session acts were adopted, for the purpose of impeaching the constitutional integrity of that procedure, is wholly inadmissible." See, also, Lowery v. English, supra.

That being true, it cannot be said that the classes exempted in the Penal Code are exempt only from the punishment therein provided for violation of the law therein contained, but that they may be subjected to the penalties prescribed in the Civil Statutes for a violation of the law as written in the latter. The law defining and prohibiting trusts, etc., is identical in both the penal and the civil statutes. While the quantum of proof and method of trial in a criminal prosecution under the Penal Code for a violation of the anti-trust laws differ from those applicable in a civil suit brought to enforce penalties under the Revised Civil Statutes, the violation charged upon which either course may be pursued by the state is of the same law and the facts constituting the violation are the same in either case. In Coffey v. United States, 116 U. S. 436, 6 S. Ct. 437, 29 L. Ed. 684, the Supreme Court of the United States, in a case where the federal statutes provided for criminal prosecution and also for penalties by forfeiture enforceable by civil suit against persons violating the internal revenue laws, expressly held that where the alleged violator had been acquitted upon a criminal prosecution, such acquittal forever barred any recovery of the penalty authorized by civil proceeding upon the same alleged violation. The same rule is clearly applicable to our own anti-trust statutes. Otherwise a party could be "again put upon trial for the same offence, after a verdict of not guilty in a court of competent jurisdiction." Article 1, § 14, Texas Const. If an acquittal under the penal laws exonerates the offender from civil penalties, an exemption under the penal laws would for like reason operate as an exemption under the same law embodied in the civil statutes; for, as stated in Lowery v. English, supra, both but form a homogeneous system of the law of the state, and both should be looked to in the interpretation and application of either. See, also, South v. State, 72 Tex. Cr. R. 381, 162 S. W. 510; Wilson v. State, 117 Tex. Cr. R. 63, 36 S.W.(2d) 733; 59 C. J. 1043.

The result is, therefore, that there is intentionally embodied in the anti-trust statutes as now constituting the laws of

the state relative to that subject, the exact exemption which the United States Supreme Court held in the Connolly Case rendered such statute of Illinois unconstitutional. In that case the court said:

"But different considerations control when the state, by legislation, seeks to regulate the enjoyment of rights and the pursuit of callings connected with domestic trade. In prescribing regulations for the conduct of trade, it cannot divide those engaged in trade into classes and make criminals of one class if they do certain forbidden things, while allowing another and favored class engaged in the same domestic trade to do the same things with impunity. It is one thing to exert the power of taxation so as to meet the expenses of government, and at the same time, indirectly, to build up or protect particular interests or industries. It is quite a different thing for the state, under its general police power, to enter the domain of trade or commerce, and discriminate against some by declaring that particular classes within its jurisdiction shall be exempt from the operation of a general statute making it criminal to do certain things connected with domestic trade or commerce. Such a statute is not a legitimate exertion of the power of classification, rests upon no reasonable basis, is purely arbitrary, and plainly denies the equal protection of the laws to those against whom it discriminates. * * *

"Returning to the particular case before us, and repeating or summarizing some thoughts already expressed, it may be observed that if combinations of capital, skill, or acts, in respect of the sale or purchase of goods, merchandise, or commodities, whereby such combinations may, for their benefit exclusively, control or establish prices, are hurtful to the public interests and should be suppressed, it is impossible to perceive why like combinations in respect of agricultural products and live stock are not also hurtful. Two or more engaged in selling dry goods, or groceries, or meats, or fuel, or clothing, or medicines, are, under the statute, criminals, and subject to a fine, if they combine their capital, skill, or acts for the purpose of establishing, controlling, increasing, or reducing prices, or of preventing free and unrestrained competition amongst themselves or others in the sale of their goods or merchandise; but their neighbors, who happen to be agriculturalists and live-stock raisers, may make combinations of that character in

reference to their grain or live stock without incurring the prescribed penalty. Under what rule of permissible classification can such legislation be sustained as consistent with the equal protection of the laws? It cannot be said that the exemption made by the 9th section of the statute was of slight consequence, as affecting the general public interested in domestic trade and entitled to be protected against combinations formed to control prices for their own benefit; for it cannot be disputed that agricultural products and live stock in Illinois constitute a very large part of the wealth and property of that state.

"We conclude this part of the discussion by saying that to declare that some of the class engaged in domestic trade or commerce shall be deemed criminals if they violate the regulations prescribed by the state for the purpose of protecting the public against illegal combinations formed to destroy competition and to control prices, and that others of the same class shall not be bound to regard those regulations, but may combine their capital, skill, or acts to destroy competition and to control prices for their special benefit, is so manifestly a denial of the equal protection of the laws that further or extended argument to establish that position would seem to be unnecessary.

"We therefore hold that the act of 1893 is repugnant to the Constitution of the United States, unless its 9th section can be eliminated, leaving the rest of the act in operation."

The court thereupon held that the statute must be regarded as an entirety, and it could not be said that the Legislature would have enacted it without the exemption of farmers and stock raisers which it expressly made. In view of the repeated and persistent inclusion in the Texas statutes by the Legislature of the classes exempted in article 1642 of the Penal Code of 1925, the same reasons are particularly applicable to the Texas statutes on the subject, and for the same reason they must fall as in contravention of the Constitution of the United States. The Supreme Court of the United States having thus positively and clearly spoken in the Connolly Case, and having never receded from the holding therein announced, we have no alternative but to follow its determination of the same issue presented in the instant case.

It is also urged that the anti-trust laws of Texas have been rendered invalid by the

Legislature through the enactment and amendment of the Co-Operative Marketing Act (chapter 8, title 93, arts. 5737–5764, R. S. 1925, as variously amended; see Vernon's Ann. Civ. St. arts. 5737–5764), because the corporations therein authorized are exempted from the provisions of the anti-trust laws by article 5762, R. S. 1925. The Attorney General, on the other hand, urges that the classifications made in the Co-Operative Marketing Act are reasonable and have a just and proper relation to the subject-matter of said legislation; that the Legislature clearly had the power to make such classifications; that same are not arbitrary nor discriminatory and do not affect the validity of the anti-trust laws. And further that if the amendments to that act do bring it in conflict with the federal decisions and with the provisions of the anti-trust laws, the amendments to the Co-Operative Marketing Act thereby become invalid and of no force and effect, and do not affect the validity of the anti-trust laws. Numerous cases from various states and of the United States Supreme Court bearing upon the question are cited, reviewed, and distinguished by both appellant and appellees.

We do not deem it necessary to set out or discuss the various provisions and amendments of the Co-Operative Marketing Act. It was originally passed in 1921, and that act was carried forward and embodied in the articles above indicated of the Revised Statutes of 1925. The original act was before the Supreme Court of Texas in Lennox v. Texas Cotton Co-op. Ass'n., 55 S.W.(2d) 543, in a suit on a contract between the association and a member thereof; and the Court of Civil Appeals in Hollingsworth v. Texas Hay Ass'n, 246 S. W. 1068; in both of which cases said act was held not to be in violation of the anti-trust laws. In the Lennox Case the Supreme Court obviously based its decision in large measure upon the Clayton Act of 1914 (38 Stat. 780), and the Capper-Volstead Act of 1922 (7 USCA §§ 291, 292) of the Federal Congress, and the decision of the Supreme Court of the United States in Liberty Warehouse Company v. Burley Tobacco Growers' Co-op., 276 U. S. 71, 48 S. Ct. 291, 72 L. Ed. 473. The Kentucky statute involved in the case last above cited provided for a nonprofit association, composed only of producers, and limited the contracts of the corporation organized thereunder to members only. It is obvious, however, that the amended Texas Co-Operative Market-

ing Act goes much further than that. As amended the Texas act greatly enlarges the provisions of the original act, authorizes the formation thereunder of corporations with capital stock, both common and preferred, provides for the creation of reserves, authorizes profits not to exceed 8 per cent., the handling of products of nonmembers, the acquisition of stock in other corporations such as gins, oil mills, compresses, canning factories, etc., and of corporations handling farm implements, machinery, etc. In brief, it is urged by appellees with much force that the corporations authorized by the Texas act as amended may depart from the purposes of the original marketing act, and that they need not any longer remain merely mutual or co-operative marketing associations; but that the law now authorizes, under the terms of said act, corporations to be formed for profit as any other corporation under the general law, but grants immunity from the penalties of the anti-trust laws; whereas, other like corporations doing a similar business, but not organized under the Co-Operative Marketing Act, are subject to the penalties of the anti-trust laws. That is to say, that the amended Texas Marketing Act, appellees contend, because of said provisions, comes within the scope of the Oklahoma act, held to be unconstitutional as discriminatory by the Supreme Court of the United States in Frost v. Corporation Comm., 278 U. S. 515, 517, 49 S. Ct. 235, 73 L. Ed. 483; and under the condemnation of that court as creating a purely arbitrary classification in Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375, and Smith v. Cahoon, 283 U. S. 553, 554, 51 S. Ct. 582, 75 L. Ed. 1264. It will thus be seen that a serious question is thus presented both as to validity of the Co-Operative Marketing Act, as to its bearing upon the anti-trust laws, and the reasonableness of the classifications made by the Legislature thereunder. Because of the divergent views of the different courts thereon, and our conclusion that our anti-trust laws are rendered unconstitutional under Connolly v. Union Sewer Pipe Co., supra, because of the exemption contained in article 1642, P. C. 1925, we refrain from passing upon the questions presented relative to the Co-Operative Marketing Act.

Nor do we find it necessary to pass upon the effect that the National Industrial Recovery Act has upon the Texas anti-trust laws. Whether that act invades the field of intrastate commerce, and its constitu-

tionality, are questions for the federal courts. If our anti-trust laws are unconstitutional, as we have concluded for the reasons above set forth, the effect of the National Recovery Act thereon becomes immaterial. In any event that act expires according to its own terms on June 16, 1935. Whether it will be re-enacted, and if so, in its present form, are now of course mere matters of conjecture.

Other grounds are urged as sustaining the trial court's action, but need not be further considered here under the conclusions above announced. The record is voluminous, the transcript containing 2,250 pages. The case has been ably and exhaustively briefed by appellant and appellees, some filing separate and others joint briefs. The briefs of the various parties aggregate more than 1,300 printed pages, and raise numerous interesting and important questions ably presented. Pleas in limine, improper joinder of parties, validity of the attachments levied, and such kindred questions, under the conclusion reached, we have found it unnecessary to consider. Whatever the ground upon which the trial court based its judgment, we think the demurrer was properly sustained under the conclusion reached by us as above indicated. The trial court's judgment will, therefore, be affirmed.

Affirmed.