**STATE v. FORD MOTOR CO.**
No. 9310.

Court of Civil Appeals of Texas.   Austin.
Jan. 20, 1943.

Rehearing Denied March 17, 1943.

Gerald C. Mann, Atty. Gen., Benjamin Woodall, Asst. Atty. Gen., and Pat Coon, Asst. Atty. Gen., for appellant.

Allen & Allen, of Dallas, Bodman, Longley, Bogle, Middleton & Armstrong, of Detroit, Mich., and Black, Graves & Stayton, of Austin, for appellee.

BLAIR, Justice.

By its fifth amended original petition appellant, the State of Texas, sued appellee, Ford Motor Company, a Delaware corporation with a permit to do business in Texas, herein called Ford, under the anti-trust statutes (Arts. 7426 to 7447, R.S. 1925, Vernon's Ann.Civ.St. arts. 7426–7747), to perpetually enjoin certain alleged unlawful combinations, agreements, conspiracies, unlawful acts, conduct, and practices in violation of the statutes, and to collect the stated penalties prescribed by the statutes for such violations. To this petition the trial court sustained "Special Exceptions Nos. II to XX, inclusive," which struck out all allegations essential to the suit, and upon the refusal of the State to further amend dismissed the suit; hence this appeal.

Like special exceptions had theretofore been sustained to the State's original petition and to its first, second, third and fourth amended original petitions; but as to each of these petitions the State undertook to amend. These pleadings are in the record, but since the fifth amended original petition supersedes all prior pleadings no further notice need be made of them, except to observe that in sustaining certain special exceptions to the third amended original petition the trial court's order recited that the State, "through its counsel, having in open court stated that it was not contending that the written contract attached * * * to petition standing alone constituted a violation of the anti-trust laws." No such statement was made with respect to the same contract attached to the petition here involved; but to the contrary it is alleged and here contended that said written sales contract ,or agreement between Ford and each of its Texas dealers is in violation of the anti-trust laws of this State, and particularly the provisions thereof entitled "Service Commission," "Genuine Ford Parts," and "Operation of Business" which operate to fix territory, fix the prices, and to restrict and control the resale of Ford's said commodities; that the contract is therefore by its express terms a violation of the anti-trust laws; and that it is so under the interpretation and construction given to it by Ford and its agents, representatives, and its Texas dealers, and in the manner of the enforcing and carrying out of the contract. The petition further alleged that, "but in addition thereto, there were other agreements and conspiracies and combinations in capital, skill and acts between it and its Texas dealers in violation of the anti-trust laws of Texas, as to retail prices; preventing one dealer soliciting sales in another dealer's town; preventing one dealer from operating a used car lot in another dealer's town; preventing a dealer from having parts in his place of business not manufactured by defendant; and other territory restricting agreements, to be hereinafter set out."

The trial court sustained "Special Exceptions II to XX, inclusive," to the petition here involved, but generally upon three grounds, as follows:

1. That the sales contract or agreement attached to the petition was not one in violation of the anti-trust statutes of this State.

2. That the petition did not allege the name or names of the agents or representatives of Ford who made the "other agreements and combinations and conspiracies" challenged by the State.

3. That the allegations with respect to "other agreements, etc.," were too in-

definite, or too general, and constituted conclusions of the pleader with respect to the matters challenged by the State.

We are of the view that the trial court erred in sustaining each of the special exceptions presented. The sales agreement or contract between Ford and each of its Texas dealers was attached to and made a part of the petition for all purposes, and a copy is appended to and made a part of this opinion.

The petition is lengthy, and except where quoted the substance of the allegations will be stated and as taken from the entire petition rather than from any particular paragraph. It alleged in detail and particularly the various combinations, agreements, conspiracies, acts, conduct, understandings, and practices existing between Ford and its Texas dealers.

By paragraph III the petition alleged that Ford is engaged in the manufacture and sale of automobiles, known as Fords, Ford Trucks, Mercuries, Lincoln-Zephyrs, and Lincolns, and of parts and accessories therefor; that Ford makes sales of such products and commodities to Texas dealers for resale to the public by and through an organization or set-up consisting of two offices, one at Dallas and one at Houston, dividing the State of Texas into the Northern District of Texas and the Southern District of Texas; that the personnel of each branch office is composed of a branch manager, an assistant branch manager, a sales manager, and an assistant sales manager, a chief clerk, and deputy clerk, and numerous "traveling roadmen," the duties of all of whom under the organization or set-up being alleged, and the names of all known to the State being alleged, as well as the names of all officers, agents, and representatives of Ford in Dearborn, Michigan, its principal place of business, who had duties and responsibilities connected therewith; and that it was by and through this organization and set-up and these officers, agents, representatives, and others unknown to the State, but known to Ford, that all of the thereinafter alleged unlawful combinations, agreements, conspiracies, unlawful acts, conduct and undertakings were made and carried out with the Texas dealers, all of which were alleged to be agreements, conspiracies, combinations and unlawful acts and conduct of capital, skill, and acts between Ford and its Texas dealers in violation of the anti-trust statutes of Texas; and all of which will be hereinafter pointed out.

By paragraph IV the petition alleged that Ford, on or about September 1, 1938, entered into a written sales agreement or contract with the several Texas dealers named in paragraph IV, which contract in form and terms was the contract or agreement required of all Texas dealers, the only difference between the contracts being as to kind of automobiles or commodities sold to the dealers and the prices therefor. The petition alleged that under the express terms of such sales contract or agreement the title to the products or commodities passed immediately upon delivery to the Texas dealers, with the right under the laws of this State to sell or dispose of them at any place in this State and at any price they may deem proper and to their best interest; but that under the express terms of the written sales agreement or contract, and particularly the provisions entitled, "Service Commission," and "Genuine Ford Parts," and "Operation of Business", it is expressly provided, and "such provisions operate to limit territory, fix the prices, and to restrict and control the resale of defendant's (Ford's) said commodities," all in violation of the anti-trust statutes of this State. The petition also alleged in this connection that Ford and its Texas dealers have construed the written sales contract or agreement as fixing the territory in the vicinity of, and including surrounding communities neighboring each dealer's place of business, required in each instance to be established, and to resell Ford's products and commodities only in such territory; that pursuant to said agreement and construction thereof, Ford and its agents have changed territories of dealers from time to time, adjusted disputes relating thereto, and have threatened to, and in certain instances alleged have, actually terminated the sales agreement of dealers who violated the territory provisions or price provisions and schemes as reflected by the written contract. The petition further alleged in this connection and with respect to the "other agreements, combinations and conspiracies," in addition to those expressly provided for by the terms of the written contract, and "put into force and effect on September 1, 1938, and simultaneously with the execution of said written sales agreement," that "it was intended and interpreted and construed by

the parties, defendant (Ford) and all of its Texas dealers, that said written sales agreement did not represent all of the agreements and combinations, and was only a part of the conspiracy put into effect by the defendant Ford Motor Company and its Texas dealers as of September 1, 1938," all of which were alleged to have remained in force from that time until the time of the filing of the petition here involved.

By paragraph V of the petition it is alleged with respect to the written sales agreement or contract and the "other agreements, combinations and conspiracies * * * put into force and effect on or about September 1, 1938, and simultaneously with the execution of said written agreement," that Ford and each of its Texas dealers thereby agreed and conspired to limit and restrict the resale of all Ford products and commodities to which title passed to the dealer under the written sales agreement in substance, as follows:

1. To resell each product or commodity of Ford only in the town or city where each dealer's place of business is shown by the written contract to be located, thereby limiting and restricting the territory or area for resale within this State.

2. To resell each product or commodity of Ford at certain prices, referred to in the written sales agreement or contract as "list prices," and as from time to time communicated by Ford to each dealer by printed booklet forms, pamphlets, telegrams, and by "price lists," which the written agreement required to be posted in each dealer's place of business, and which list prices must·be followed by each dealer.

3. To prohibit each dealer soliciting business or having a salesman of Ford products or commodities in any other town or city where there is located another dealer in such products or commodities.

4. To prohibit each dealer from having a used car lot in any other town or city than where the contract shows the place of the particular dealer to be located.

5. To prohibit each dealer from having in his place of business any other parts or accessories than genuine parts or accessories manufactured and sold by Ford.

The petition further alleged the purposes and effect of such combinations, agreements and conspiracies to be in violation of the anti-trust statutes of the State; and particularly plead the definition of "trusts" as contained in Art. 7426, R.S.1925, and as being agreements, conspiracies, trusts and combinations of capital, skill and acts for the following purposes:

"(1) To create, or which may tend to create, or carry out restrictions in trade and commerce and aid to commerce and in the preparation for market of automobiles, parts and accessories, and to create and carry out restrictions in the free pursuit of the business of retailing said automobiles, parts and accessories within the State of Texas, which is a business authorized and permitted by the laws of the State of Texas.

"(2) To fix, maintain, increase and reduce the price of automobiles, parts and accessories, and the cost of the preparation of said automobiles, parts and accessories for market within the State of Texas.

"(3) To prevent and lessen competition in the manufacture, making, sale and purchase of automobiles, parts and accessories, and to prevent and lessen competition in aids to commerce, and in the preparation of automobiles, parts and accessories for market within the State of Texas.

"(4) To fix and maintain standards and figures whereby the price of automobiles, parts and accessories and the cost of the preparation of automobiles, parts and accessories for market could be and were affected, controlled and established, within the State of Texas.

"(5) To make, enter into, maintain, execute and carry out contracts, obligations, and agreements by which the defendant and its Texas dealers bind themselves not to sell, dispose of, or prepare for market, automobiles, parts and accessories, and to make contracts by which the defendant and its Texas dealers agree to keep the price of automobiles, parts and accessories at a fixed and graded figure, and by which they affected and maintained the price of said automobiles, parts and accessories, and by which they did preclude a free and unrestricted competition among themselves and others in the sale of said automobiles, parts and accessories, within the State of Texas.

"(6) To regulate, fix and limit the output of automobiles, parts and accessories, which have been and were to be manufactured; and to regulate, fix and limit the amount of work that was to be done in the preparation of automobiles, parts and accessories for market.

508

"(7) To abstain from engaging in and continuing the retail automobile business and to abstain from the purchase and sale of automobiles, parts and accessories within the State of Texas."

By paragraph VI the petition plead in full the provision in the written contract or agreement, entitled "Service Commission," as shown in the appendix hereto, and alleged that this provision constituted on its face a restriction in violation of the anti-trust statutes, in that it constituted an agreement whereby each Texas dealer is limited to a certain fixed territory in the vicinity of and including surrounding communities neighboring each dealer's place of business, in which to resell the Ford products and commodities sold to them under the written contracts, Ford agreeing not to sell any other person or dealer in the territory, and the dealer agreeing not to sell any person or firm outside of the territory in which their respective places of business were located; that the provision entitled "Service Commission" was so intended and was so interpreted and construed to restrict and confine resale to certain territory; and was intended, interpreted and construed in carrying out the written sales agreement between Ford and its dealers as fixing the price for which automobiles of Ford could be resold; it being agreed that under the various written sales agreements that the price of $30 was the average profit for the sale of a new Ford automobile; the price or profit of $40 for a Mercury; the price or profit of $50 for a new Lincoln-Zephyr; and the price or profit of $125 for a new Lincoln. The petition further alleged in this connection that under the provision entitled "Service Commission," and the construction and interpretation placed upon it by Ford and the dealers in enforcing and carrying out the written sales agreements, Ford threatened on many occasions to, and on the several occasions specified in paragraph XI of the petition did actually, cancel the written sales agreements of those named and by the agents and representatives· of Ford named for violation of the territory restrictions; and did adjust and require certain named dealers to pay the commission prescribed to dealers whose territory had been violated, all of which was done under and by virtue of this "Service Commission" provision which made Ford the sole umpire for determining territory disputes and liability of payment of service commissions as between Texas dealers provided for in the provision called "Service Commission;" and that while the exact or certain boundaries of each territory of each dealer is not known to the State, it is known to Ford and its dealers; but that such territory is defined and limited to a certain fixed territory in the vicinity of and including surrounding communities neighboring each dealer's place of business as located by the written sales agreements.

By paragraph VII the petition alleged that the provision entitled, "Retail Prices," in the written sales agreement, as shown in the appendix hereto, was an agreement to fix the resale prices of all Ford commodities and products, and was so under the construction and interpretation placed upon the agreement by the parties; certain specific acts and practices whereby Ford and its dealers so construed the provision in the enforcement and carrying out of same were alleged by paragraph XI of the petition.

By paragraph VIII the petition plead in full the provision of the written sales agreement entitled "Genuine Ford Parts," as shown in the appendix hereto, and alleged that same constituted an agreement, and as construed, interpreted and carried out did constitute an agreement whereby Ford and its dealers agreed not to have in their respective places of business and not to sell any replacement parts manufactured by any other manufacturer than Ford; all in violation of the provisions of the anti-trust statutes of this State.

By paragraph IX the petition alleged that the provision entitled "Operations of Business," in the written sales agreement, as shown in the appendix hereto, was an agreement between Ford and its dealers to maintain "only one place of business," and that as construed and interpreted by them, and as enforced and carried out, each and all dealers agreed not to maintain a used car lot in any other city or town than where the respective sales agreements showed any dealer's business to be located; and that as a part of said written provision each and all dealers and Ford agreed not to permit any salesman of any Ford products or commodities to solicit or sell same in any other city or town where another dealer resided and maintained a place of business; all in violation of the anti-trust

statutes of this State, as specifically alleged under herein quoted Sections "(1)" to "(7)", both inclusive.

By paragraph X of the petition it was alleged that Ford and certain dealers, naming one of them, had entered into what is described as "Parts Panel Territory and Customer Limitation" written agreement, not a part of the aforementioned sales agreement, whereby as parts distributors by trucks the parties agreed and were limited to resale of parts in certain fixed territory within Texas, and agreed to call upon specified customers on certain days of each week, all of which agreements limited and controlled the resale of Ford parts and accessories in violation of the anti-trust statutes plead.

By paragraph XI the petition alleged that by reason of the provision of the written sales agreement requiring each dealer to acquire and equip at a large expense a building in which to resell Ford's products and commodities, and the provision giving Ford the power to cancel any written sales agreement without cause on short notice, Ford was able to and did consummate, enforce and carry out the written sales agreements, other agreements, conspiracies, combinations, and unlawful acts theretofore alleged to be in violation of the anti-trust statutes plead; and that the certainty and effectiveness of such unlawful combinations, conspiracies and agreements were shown in carrying out, putting into effect and continuing the existence of same by the 62 specific instances alleged whereby Ford, its agents and representatives named, and its Texas dealers named, on certain dates by certain acts and conduct executed and carried out the conspiracy alleged to be in compliance with the unlawful combinations, conspiracies and agreements alleged. The portion of the petition setting up these 62 instances and acts is lengthy, and the substance of a few of them will suffice to illustrate the purposes and manner of execution, interpretation, and carrying out of the unlawful conspiracy alleged, as follows:

At a meeting called by C. B. Ostrander, branch manager at Dallas, where all Ford dealers for the northern district of Texas were invited so that the written sales agreement placed in force on or about September 1, 1938, could be explained and interpreted, Ostrander stated: "The company (meaning Ford Motor Company, defendant in this cause) will not tolerate one dealer selling in another dealer's town—cross selling, and the company is going to put a stop to it."

On August 30, 1939, the sales agreement with Ray Motor Company of West, Texas, was terminated because it failed to pay the $30 penalties for sales in Waco and elsewhere; the manager of the Dallas branch office giving the following as the reason to the Dearborn office: "Dealer is very uncooperative on a large number of sales and service programs intended to benefit him and assist him in making additional profits. These matters have been taken up with our organization repeatedly without avail."

The sales agreement of Earl Lide of Mt. Pleasant was cancelled because he refused to pay the $30 penalty for making sales in towns where other dealers resided; and the branch manager of Ford at Dallas gave the following reason: "Dealer has repeatedly refused to adopt suggestions for merchandising product in keeping with modern day conditions. Management has thoroughly gone into question of representation at this point with dealer and has periodically called dealer's attention to unsatisfactory sales and profit situation." On May 19, 1939, E. A. Klemmedson, assistant manager of the Dallas branch, refused to require the Big Spring, Texas, dealer to send to the Long Beach, California, dealer $50 for having sold a Lincoln-Zephyr to a resident of Long Beach who had been away from Long Beach more than 30 days, and gave as reason therefor that the transaction did not involve any destructive trade practice within the meaning of the sales agreement.

On August 16, 1939, Klemmedson answered an inquiry of Carsey Motor Company of Greenville, Texas, as to how many days after a resident moved from Greenville to another town could a sale be made without incurring the $30 penalty. It was informed that as soon as the purchaser moved to another town he is protected to the dealer of that town, and the fact that the Greenville dealer had been dickering with the resident prior to the time of his removal would not prevent liability for the $30 penalty.

On August 8, 1939, Klemmedson instructed N. E. Gordon, manager of Zone G, that Gulf Camp was near to the town of Crane, and that the Crane dealer should collect the commission on sales made by other dealers to residents of Gulf Camp,

and instructed Gordon to see that prompt payment was made on any claim of $30 against other dealers on sales made to residents of Gulf Camp.

On March 1, 1939, Klemmedson informed the Ford branch at Houston to the effect that Duke H. Herbert Motor Company of Nacogdoches, Texas, had a salesman by the name of Pete Rogers, who was trying to make sales in the town of Henderson, Rusk County, Texas, where Alfred Brothers Motor Company, a Ford dealer, resided; and that Alfred Brothers Motor Company stood to lose several sales on account of higher bids being made by this Pete Rogers to prospects residing in the territory and under the jurisdiction of Alfred Brothers.

On March 18, 1939, J. Long of Long Motor Company of Gilmer, Texas, a Ford dealer, demanded payment of $30 from Young Motor Company of Tyler for having traded cars with Bob Wright of Gilmer, Texas.

On March 30, 1939, C. B. McCown of the sales department of the Dallas branch of the Ford Motor Company informed L. H. Ridout, Jr., in Zone B, that as to the $30 claimed by Farmersville v. Downtown Motors, the Farmersville dealer would not be protected against sales by other dealers unless the purchasers had their legal residence in Farmersville.

On January 21, 1939, Ruby Lee Brooks of Brooks Motor Company of Stamford, Texas, informed the Dallas Ford branch that Duke H. Herbert, Ford dealer in Nacogdoches, owned a used car lot in Stamford, Texas, and was bootlegging new cars in Stamford. Thereafter, the Houston branch office made investigation and expressed doubt that Duke Herbert was so operating the lot, relaying this information to Dallas. Ruby Lee Brooks checked the registration of cars on the lot and determined them to belong to Duke H. Herbert, after which time Duke H. Herbert promised to cease and did cease such practice of selling used cars from a used car lot in Stamford, Texas; for which Ruby Lee Brooks thanked M. M. French, Zone manager of Ford, for his assistance in the matter and informed him that she did not believe Duke Herbert was sending any more used cars out there.

On July 1, 1938, the Dallas branch of Ford Motor Company, after a survey of the business operation of Carsey Motor Company, informed Carsey Motor Company that its average new car free service per unit was $3.

August 2, 1939, Mrs. N. B. Copeland of Duke H. Herbert dealership of Nacogdoches, Texas, informed Deaton of Ford Motor Company of Houston that Alfred Brothers of Henderson were operating their "parts panel truck" in Garrison, Texas, and that the salesman for Alfred Brothers said this is a free country and he would make this territory as long as he pleased. Deaton relayed this information to the Dallas branch, stating that the territory of Garrison, Texas, was assigned the Nacogdoches dealer, and suggested that such practice be discontinued by the Henderson dealer. Thereafter, on September 15th, C. A. Martin, Zone manager, having discussed the matter with Alfred of Alfred Brothers, assured the Houston branch that Alfred Brothers had agreed to quit selling parts in the borderline town of Garrison.

At the time of the coming out of the 1940 model automobiles, C. B. Ostrander sent a telegram to all dealers within the northern district of Texas, which reflected the prices wholesale to the dealer, and suggested retail prices on all model Ford passenger cars at the Dearborn factory, with the company's charges for distribution and delivery, and all federal, state and government taxes, gasoline, oil and antifreeze extra; also setting out the equipment indicated on all Ford V-8 types, together with all accessories and the wholesale price to the dealers and the suggested retail price on accessories; and the prices of 1940 model 85-horse power Ford trucks and commercial cars at the Dearborn plant, together with the charge for distribution and delivery, gasoline, oil and antifreeze extra, and the wholesale price to the dealer and the suggested retail price of each commercial car, and suggested retail price of all accessories and extras for trucks.

On November 7, 1938, G. E. Coon, chief clerk of the Houston branch, sent out a general letter containing eleven stenciled pages addressed to all Houston branch dealers, containing the following: "We are giving you below consolidated price list, showing both wholesale and suggested retail prices applying at Houston, Texas, on our 1939 model passenger, commercial and truck units. For dealers in cities other than Houston those prices can be adjusted to conform with company's charges for distribution and delivery applicable to each dealership; also, difference in Federal

taxes as a result thereof. 'Prices shown, both wholesale and retail, include conditioning and handling charge. All prices shown herein are subject to change without notice." Thereafter the wholesale and suggested retail prices were observed by the dealers.

Numerous other and similar specific instances were alleged whereby Ford through its named agents and dealers received complaints relating to violations of territory rights, adjusted them and made dealers pay the commission due for sale of the several makes of automobiles to other dealers in whose territory the purchaser resided; settled and required parts panel distributors by trucks to cease violations of the territory rights of other dealers; received numerous complaints as to violations of retail prices of both automobiles and parts, adjusted them and caused certain dealers to respect them; received complaints as to territory violations between Texas dealers and Ford's dealers in Old Mexico and adjusted them; and that with respect to all specific instances and many others of similar purport Ford and its dealers were acting under, interpreting, construing, enforcing and carrying out the written sales agreement and other simultaneous agreements and conspiracies and combinations and understandings and schemes, as alleged and in violation of the anti-trust statutes plead.

■ Construed in its entirety the written sales agreement is a trust or conspiracy as defined by Arts. 7426 and 7428, and as interpreted by Ford and its Texas dealers, and is particularly so in the manner of enforcing and carrying it out. Standing alone the provisions entitled "Operation of Business," "Retail Prices," "Service Commission," and "Genuine Ford Parts" are somewhat in the nature of an agency agreement whereby the Texas dealers undertake to provide and equip "only one place of business" in the city or town described, and in which to sell only Ford products, and to maintain a repair shop and a used car outlet only in the neighborhood of the place of business, all of which must be approved by Ford; to not "resell (Ford's) products * * * at less than retail prices established for Dealer's city or town from time to time by" Ford; to require each dealer to pay upon any new automobile sold a "service commission" to the dealer in the city or town where the purchaser resides, the amount being from $30 to $125, depending upon the make of the automobile sold, and being the usual amount of the commission or profit which a dealer made on the sale of such a new automobile; to sell and display only genuine Ford parts as advertised by Ford in such place of business or repair shop; and as to all of which provisions Ford is the sole arbiter, with the authority to cancel any sales agreement without cause and upon short notice. The written sales agreement expressly provides, however, that it is not an agency agreement; and that the title to all Ford products sold thereunder passes immediately upon delivery to the dealer. Thus Ford has clearly stipulated that it will not assume the liabilities incident to an agency agreement, and that the relationship between the parties is that of seller and purchaser for resale to the public of automobiles and parts therefor in a prescribed territory and at the prices established from time to time by Ford; and in consequence the parties to the agreement must assume that status in the resale of such products to the public. We do not understand Ford to contend that the written sales agreement is an agency contract; but it does cite in support of its contention that the agreement does not violate our anti-trust statutes cases which relate to agency agreements and which are not in point here. A copy of the written sales agreement between Ford and its Texas dealers is attached to its brief wherein it is contended that it is not one in violation of the anti-trust statutes plead. We construe it to be so.

Article 7426 defines a "trust" as being "a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of" the purposes set out in subdivisions "1" to "7", which "create, or which may tend to create, or carry out restrictions in trade or commerce," such as (1) "To fix, maintain, increase or reduce the price of merchandise, produce or commodities" sold on the market; (2) "To prevent or lessen competition in the * * * sale or purchase of merchandise, produce or commodities"; (3) "To fix or maintain any standard or figure whereby the price of any article or commodity of merchandise, produce or commerce * * * shall be in any manner affected, controlled or established"; (4) "To make, enter into, maintain, execute or carry out any contract, obligation or agreement by which the

parties thereto bind, or have bound themselves not to sell, dispose of, * * * any article or commodity * * * at a price below a common standard or figure or by which they shall agree in any manner to keep the price of such article or commodity * * * at a fixed or graded figure, or by which they shall in any manner affect or maintain the price of any commodity or article * * * to preclude a free and unrestricted competition among themselves or others in the sale * * * of any such article or commodity * * * or by which they shall agree to * * * combine or unite any interest they may have in connection with the sale or purchase of any article or commodity * * * whereby its price * * * might be in any manner affected;" and (5) "To abstain from engaging in or continuing business, or from the purchase or sale of merchandise, produce or commodities partially or entirely within the State of Texas, or any portion thereof."

Article 7428 defines "a conspiracy in restraint of trade" to be "where any two or more persons, firms, corporations or associations of persons, who are engaged in buying or selling any article of merchandise, produce or any commodity enter into an agreement or understanding to refuse to buy from or sell to any person, firm, corporation or association of persons, any article of merchandise, produce or commodity."

The petition alleged facts which show an express violation of these quoted provisions of the anti-trust statutes. It alleged the execution of the written sales agreement between Ford and each of its Texas dealers, naming some of them, Ford acting by and through its Texas organization or set-up, and the scheme or plan whereby Ford sold automobiles and parts thereof to the Texas dealers for resale to the public. The written sales agreement is hereinabove construed and interpreted by us as being on its face, and in the light of the facts and circumstances surrounding its execution, in violation of said above quoted provisions of the anti-trust statutes. The petition further alleged specific instances whereby Ford and its Texas dealers in numerous instances construed and interpreted the written sales agreement as providing that each dealer could resell automobiles and parts only in the territory immediately surrounding the particular city or town named in any sales agreement; and alleged specific instances whereby Ford and its agents and Texas dealers actually carried out and enforced the stipulation limiting resales in certain territory to the extent that dealers who sold new automobiles to a purchaser in another dealer's territory were required to pay the latter the commission or profit ordinarily made by a dealer on the sale of such automobile; Ford cancelling the sales agreements of certain named dealers and adjusting and requiring others to cease selling in another's territory under the interpretation placed upon the sales agreement by the parties.

Our courts are uniform in holding that any contract, trust, combination, or conspiracy by which a manufacturer agrees to sell and a buyer agrees to resell any article, product, or commodity of commerce within a designated territory or area is within the express prohibition of the above quoted portions of the anti-trust statutes. Fuqua v. Pabst Brewing Co., 90 Tex. 298, 38 S.W. 29, 750, 35 L.R.A. 241; Pasteur Vaccine Co. v. Burkey, 22 Tex.Civ.App. 232, 54 S.W. 804; American Brewing Ass'n v. Woods, Tex.Com.App., 215 S.W. 448; Norton v. W. H. Thomas & Sons Co., 99 Tex. 578, 91 S.W. 780; W. T. Rawleigh Co. v. Land, Tex.Civ.App., 261 S.W. 186, Tri-States Sales Co. v. National Automatic Machine Co., Tex.Civ.App., 38 S.W.2d 838; National Automatic Machinery Co. v. Smith, Tex.Civ.App., 32 S.W.2d 678; 29 Tex.Jur. 749 to 763.

In this connection the State also alleged the same facts and specific instances as constituting a scheme, trust or combination, or a conspiracy in violation of the above quoted provisions of the anti-trust statutes; and the rule is that an unlawful combination or conspiracy to render a principal contract void as violating the anti-trust laws need not be disclosed by its terms, but it is sufficient if the contract is part of a covert scheme to conduct business in an unlawful manner. Burpee Can Sealer Co. v. Henry McDonnell Co., Tex.Civ.App., 75 S.W.2d 458, error refused.

In addition to the facts alleged and the acts of the parties relating to fixing of territory, the petition also alleged specific facts with regard to the sales agreement and the provisions with regard to prices for which automobiles and parts might be resold by a dealer; and alleged that such written agreement under the interpretation

and construction placed upon it by the parties and under the specific instances plead whereby it was enforced so as to require the dealer to sell automobiles and parts at the price fixed by Ford from time to time, constituted violation of the above quoted provisions of the anti-trust statutes. It would be hardly more than a repetition of the rule just stated to say that such a contract to fix the prices, by a seller and a buyer of commodities or products of commerce for resale is in violation of the anti-trust laws. See authorities above cited, and Dickerson v. McConnon & Co., Tex. Civ.App., 248 S.W. 1084; W. T. Rawleigh Medical Co. v. Gunn, Tex.Civ.App., 186 S.W. 385; Whisenant v. Shores-Mueller Co., Tex.Civ.App., 194 S.W. 1175; W. T. Rawleigh Medical Co. v. Fitzpatrick, Tex.Civ.App., 184 S.W. 549; Pictorial Review Co. v. Pate Bros., Tex.Civ.App., 185 S.W. 309; W. T. Rawleigh Medical Co. v. Mayberry, Tex.Civ.App., 193 S.W. 199; Hubb-Diggs Co. v. Mitchell, Tex. Civ.App., 231 S.W. 425; W. T. Rawleigh Co. v. Lemon, Tex.Civ.App., 247 S.W. 683; McConnon & Co. v. Marshall, Tex.Civ. App., 280 S.W. 323; W. T. Rawleigh Co. v. Bradberry, Tex.Civ.App., 290 S.W. 870; Texas Brewing Co. v. Meyer, Tex.Civ.App., 38 S.W. 263; Simmons & Co. v. Terry, Tex.Civ.App., 79 S.W. 1103; Star Mill & Elev. Co. v. Ft. Worth Grain & Elev. Co., Tex.Civ.App., 146 S.W. 604; and 29 Tex. Jur. 749 to 756, and cases there cited, and pages 760 to 764 of same authority.

The petition further alleged that simultaneously with the execution of the written sales agreement between Ford and its Texas dealers they made other agreements, combinations, and conspiracies which have continued in force until the filing of the amended petition in question; alleging specific instances whereby such agreements, combinations and conspiracies were carried out, and showing that under them Ford and its Texas dealers actually limited the operation of dealers in selling new automobiles and parts therefor, and in the resale of used automobiles, and with regard to parts panel contracts or agreements to specific territory, all in violation of the above quoted anti-trust statutes.

Special exceptions were sustained by the trial court to the effect that the petition did not name the time, place, nor parties by whom Ford was represented in making such "other agreements." We think it evident from the pleadings that such other agreements were made simultaneously with the execution of the written sales agreement; and the intent of the pleader and the clear import of the pleading is that they were executed by the same parties who executed the written sales agreement, and by the officers and agents of the organization or set-up by and through which Ford does business in Texas. In any event, the pleader was not required to plead the exact agreement and by whom made with respect to the unlawful combination or conspiracy plead. It is only the facts constituting the cause of action for conspiracy, particularly the acts which constitute the grounds or gravamen of the action, that must be alleged with certainty and particularity. This the petition did. The rule is that conspiracy ordinarily need not be proved, although alleged; or, if necessary, it may be proved, although not alleged. This is because a combination or conspiracy is more than a contract. Such combination or conspiracy often has no agreement, because parties usually do not agree to violate the law; but the action is sustained where two or more act in pursuance of a conspiracy and the result is the same. 41 C. J. 104; 15 C. J. S., Conspiracy, §§ 24 to 27, pp. 1034 to 1042. We are therefore of the view that the general allegation that a trust, combination, or conspiracy was entered into by Ford and its dealers, together with the allegations of specific instances whereby Ford and its dealers operated so as to limit the territory in which a dealer could resell automobiles and parts purchased from Ford, and also the instances whereby Ford and its dealers pursuant to such combination or conspiracy actually fixed the prices for which automobiles and parts were to be resold to the public, fully comply with the rule that in alleging a combination or conspiracy the facts constituting the conspiracy, or from which it may be inferred, should be clearly and concisely set out. Pinedo v. Halper, Tex.Civ.App., 18 S.W.2d 253. The important matter to be alleged are the facts and circumstances which constitute the conspiracy, or from which it may be inferred, but being a mere matter of inducement they need not be alleged with the particularity required in pleading the acts constituting the gist of the action; and as a rule great latitude is allowed in setting out in the petition the

particular acts from which the conspiracy may be inferred. American Rio Grande Land & Irrigation Co. v. Barker, Tex.Civ. App., 268 S.W. 506; Palatine Ins. Co. v. Griffin, Tex.Civ.App., 202 S.W. 1014, reversed on other grounds, Tex.Com.App., 238 S.W. 637.

■ The special exception, to the effect that the injunctive relief prayed for against Ford could not be granted because the dealers who were allegedly parties to the agreements, combinations or conspiracies were not parties to the suit, should not have been sustained by the trial court. The acts or conduct of each Texas dealer under the allegations of the petition are the acts or conduct of Ford as co-conspirators, and under the express provisions of Articles 7430–7435 Ford may be enjoined from carrying out the combination or conspiracy in violation of the anti-trust statutes, although the dealers are not parties to the suit. State v. Standard Oil Co., Tex.Civ.App., 82 S.W.2d 402; Id., 130 Tex. 313, 107 S.W.2d 550; Pierce Oil Corp. v. Weinert, 106 Tex. 435, 167 S.W. 808.

Under our above conclusion the judgment of the trial court sustaining the special exceptions and dismissing the cause of action is set aside, and the cause reinstated and remanded for trial on the merits.

Reversed and remanded.

## APPENDIX

SALES AGREEMENT
BETWEEN
FORD MOTOR COMPANY
and

FORD MOTOR COMPANY
——— Branch

FORD SALES AGREEMENT

Agreement made at Dearborn, State of Michigan, as of this ——— day of ——— 19—, by and between Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called "Company"), and

(State whether an individual, partnership, or corporation. If the latter show name of state in which incorporated)

with principal place of business at ———

(Street

Address)          (Town)          (County)

State of ——— (hereinafter called "Dealer").

In consideration of the promises herein made to each other by the parties hereto it is agreed as follows:

### SELLING RIGHTS

(1) Company agrees to sell and Dealer agrees to purchase, for resale for use within the boundaries of the United States of America, Ford passenger automobiles, commercial automobiles, trucks, and parts and accessories (all of which for convenience are sometimes hereinafter collectively referred to as "Company Products"), upon the terms and conditions hereinafter specifically set forth and subject to the right reserved by Company to sell to other dealers and direct to retail purchasers in the United States without obligation of any kind to Dealer on any such sale. It is intended that this agreement shall govern all relationships between Company and Dealer unless some such relationships shall be governed by another agreement in writing duly executed by an officer of Company. In case Company shall advise its dealers in a specified territory that it will not merchandise some portion of the commodities herein defined as Company products through all Ford Dealers in such territory, but only through specified dealers, and Dealer is not one of such specified dealers, then such products shall be deemed to be excluded from this agreement, any other provision herein to the contrary notwithstanding.

### PRICES

(2) Company will sell its products to Dealer at such prices as are from time to time established by Company plus Company's charge for distribution and delivery and a sum equivalent to, or in reimbursement for, any taxes imposed by any law of the United States, any state, or municipality, or other taxing authority upon the manufacture, ownership, use, or sale of any of Company products sold under this agreement, if not included in the established price.

### TERMS AND TITLE

(3) Payment by Dealer is to be in cash, except in cases where the invoice shows sale to be on credit. Title to all Company products, except in a case where the invoice shows sale to be on credit, shall be and remain with Company until actual receipt of the full purchase price in cash by Company. In case Dealer makes payment by check or by paying draft attached to bill of lading, Dealer shall pay the cost of exchange, if any. Receipt from Dealer or Dealer's bank of any check, draft or other commercial paper shall not constitute

payment until Company has received cash in the full amount thereof. Until Company has received cash in full payment of any such check, draft or other commercial paper, its right to retake and resell Company products for which such paper is issued shall continue.

### CHANGE IN PRICES

(4) Prices of all Company products shall be subject to change from time to time; however, Company agrees that, in the event of a price reduction on current models of its Ford passenger automobiles, commercial automobiles, or trucks, it will reimburse Dealer to the extent of the difference between the price at which such product was purchased and the reduced price to Dealer on any new, unused and unsold unit of said products in Dealer's stock purchased from Company during the period of sixty (60) days next preceding the change in price, as determined by date of Company's invoice, provided that Dealer files written claim for refund within ten (10) days after announcement by Company of such price reduction. Such claim shall be supported by adequate proof and subject to Company audit. Dealer shall not be entitled to any reimbursement under this paragraph (4) on account of any reduction in the amount of the Company's charge for distribution and delivery, or on account of any reduction in the amount of taxes.

### OPERATION OF BUSINESS

(5) Dealer agrees to maintain a place of business and only one place of business, unless repair shops or used automobile outlets and/or neighborhood service stations are separate from salesroom, located in a place and equipped in a manner acceptable to Company; to display conspicuously thereon approved Ford signs; to install and maintain therein the tools, machinery and equipment recommended by Company; to employ sufficient, competent salesmen to solicit adequately all potential purchasers of Company products in the community in which Dealer is located, and sufficient, competent service mechanics to render prompt, efficient service to owners of Company products and to render such service to any owners of Company products engaging such service, including the service to which a purchaser of such products from Dealer (or from another dealer who has paid Dealer the Service Commission mentioned in subparagraph (c) of paragraph 9 hereof) is entitled; to install and maintain an accounting system in accordance with Ford Dealers Accounting Procedure Manual as approved by Company; to furnish Company at regular intervals as designated by Company accurate financial statements reflecting the true financial condition of Dealer's business on standard forms provided by Company for that purpose; to allow representatives of Company, at all reasonable times and from time to time, to examine all records, contracts and accounts covering sale or service of Company products by Dealer and to examine Dealer's stock and place of business and to test Dealer's equipment and facilities to the end that Company may be assured that Dealer is carrying out all of the terms of this agreement and is properly equipped to render adequate service to owners or operators of Company products; to submit promptly to Company Dealer's Ten-Day Reports accurately and fully prepared on forms provided by Company therefor and on the dates specified therein.

### TRADE MARKS AND NAMES

(6) Dealer further agrees not to use the words "Ford," "Fordson," "Lincoln," "Zephyr," "Mercury," or any trade mark or trade name adopted by Company, or coined words or combinations containing the same, in connection with any business conducted by Dealer other than dealing in Company products, and under no circumstances as a part of Dealer's firm name or trade name; not to contest the validity of any patent used or claimed by Company, nor to contest the right of Company to exclusive use of any trade mark or trade name at any time adopted by Company.

### DEALER NOT TO ACT AS AGENT

(7) Dealer further agrees not to make any representation or warranty concerning Company products on behalf of Company, but to refer purchasers to "Ford Motor Company Warranty" printed on back of Retail Buyer's Order form supplied by Company and not in any manner to attempt to assume or create obligations on behalf of Company or in any manner attempt to act as agent of Company.

### DEALER'S STOCK

(8) Dealer further agrees:

(a) To maintain a stock of passenger automobiles, commercial automobiles and trucks of current model equivalent to between eight and twelve per cent (8% and 12%) of Dealer's retail deliveries of such

units during preceding twelve (12) months, varying between those percentages in different months in accordance with the estimated normal seasonal requirement of Dealer for the different months; to maintain a stock of genuine Ford parts and approved accessories of an assortment, reasonably comparable to the current demand, equivalent to at least one-sixth (1/6th) of the sales of parts and accessories by Dealer during the previous twelve (12) months, based on cost to Dealer. In case Dealer has not been operating under a Ford Sales Agreement during the twelve (12) months preceding the date of this agreement, Dealer agrees, until such time as Dealer has been operating under a Ford Sales Agreement for twelve (12) months, to maintain at all times a stock of new Ford passenger automobiles, commercial automobiles and trucks equivalent to the estimated sales during the next thirty (30) days and of parts and accessories equivalent to the estimated requirements for sale and service during the next sixty (60) days. The requirement that Dealer maintain adequate stocks shall be dependent on Company's ability to supply the same.

### Orders

(b) To enable Company to schedule its production effectively, Dealer shall furnish Company, prior to the tenth (10th) day of each month, with an order for the estimated number of passenger automobiles, commercial automobiles and trucks which Dealer will need for sale and to maintain stocks during the succeeding month in accordance with the provisions stated in subparagraph (a) of paragraph 8 above, and will on dates designated by Company furnish Company with orders on forms provided by Company therefor for Dealer's estimated requirements of parts and accessories for sale and to maintain stocks in accordance with the provisions stated above. Company agrees to give careful consideration to all orders received from Dealer but expressly reserves the right to follow or depart from such orders, and Company shall in no way be liable for failure to ship, or for delay in shipments however caused, or for shipping over other than routes specified by Dealer.

### Demonstrators

(c) To have available at all times in good running order and presentable condition for demonstration purposes, an adequate number of Ford units of current model (but at no time less than one passenger automobile and one commercial automobile or truck).

### TRADE PRACTICES

(9) Dealer further agrees:

(a) To avoid in every way such trade practices in connection with Dealer's competition with other Ford Dealers and in selling Company products to the public as are injurious to Company's good name and good will or are detrimental to public interest.

### Retail Prices

(b) Insofar as it is lawful for Dealer so to agree, not to resell Company products bearing Company's trade mark or trade name at less than retail prices established for Dealer's city or town from time to time by Company, except in cases where such goods have been damaged, or have become obsolete, or are about to become obsolete because of change in models, or in the case of sales to Company or its nominees, or to other authorized Ford Dealers, or Associate Ford Dealers, and except when a discount is warranted by quantity purchases unless such a discount is in violation of law. Dealer agrees, if requested by Company, to display prominently in Dealer's showroom a chart showing current minimum retail prices as established by Company for Dealer's city or town.

### Service Commission

(c) That as convenient Authorized Ford Service must be made available to users of Ford passenger automobiles, commercial automobiles and trucks and as a means to that end, in case Dealer sells a new passenger automobile, commercial automobile or truck to a buyer residing in another city or town where an authorized direct Ford Dealer is located or operates a Neighborhood Service Station under a Supplementary Sales Agreement with Company, or to a buyer residing in another incorporated municipality in which there is no such Ford Dealer or Neighborhood Service Station, but which municipality is contiguous to a city or town in which an authorized direct Ford Dealer is located, Dealer shall pay a service commission of Thirty Dollars ($30.00) to the dealer in the town where purchaser resides within five (5) days after the unit is delivered to buyer with the understanding that such other dealer agrees to render to such purchaser the service which a new car pur-

chaser ordinarily receives from the delivering dealer. In case purchaser is a resident of a multiple dealer metropolitan area, as defined below, and Dealer's place of business is not in that area, Dealer shall pay such service commission to the authorized direct Ford Dealer located nearest to place of residence of purchaser. The requirement of this subparagraph (c) that Dealer pay a service commission shall not apply, if Dealer is located in a multiple dealer metropolitan area (meaning thereby a city and such surrounding territory as Company in its absolute discretion may from time to time include within the metropolitan area of that city) and sells to a purchaser residing anywhere within such metropolitan area, to sales to owners of fleets of five (5) or more automobiles and/or trucks, or to sales to purchaser temporarily residing for more than thirty (30) days at the place where Dealer is located. Company will act as umpire between dealers in connection with these service commissions, but does not guarantee payment of any such service commission.

### Genuine Ford Parts

(d) That in view of the fact Company has in its advertising consistently urged the ultimate users of Company products to patronize its authorized dealers as being proper sources from which to procure genuine Ford, Mercury, Lincoln or Lincoln-Zephyr parts, Dealer will not, in any place of business upon which Dealer displays Company's trade mark or trade name, or any sign or indication that such place of business is that of an authorized Ford Dealer, or an authorized Ford Service Station, sell any replacement parts of the Company products except such genuine parts, nor shall Dealer recommend or allow to be recommended in such place of business, nor use in servicing Company products for owners thereof any but genuine Ford, Mercury, Lincoln or Lincoln-Zephyr parts except in cases where Company is unable to supply same or owner has specially requested Dealer to use some other part.

### Advertising

(e) Not to publish or to use advertising matter or to use sales policies in any manner in connection with Dealer's business as a Ford Dealer which are detrimental to the Company, to other Ford Dealers, or to the public, or to which Company may object as being detrimental to its good name or good will.

### Customer's Deposits

(f) That Dealer will accept down payments of cash or used automobiles in anticipation of future deliveries of passenger automobiles, commercial automobiles, or trucks only in trust, and to keep all such cash in a separate earmarked fund not commingled with Dealer's own funds, and to hold title to such used automobile only in trust until the transaction for the new passenger automobile, commercial automobile, or truck is consummated and not to place any lien thereon, or to sell the same without at the time placing the amount of the trade-in allowance of such used automobile in such earmarked trust fund in lieu of said automobile in trust. Inasmuch as failure to apply monies and properties paid or transferred to an authorized Ford Dealer in anticipation of future deliveries to the purpose for which the payment or transfer is made is likely to injure the good name and good will of Company, Dealer agrees to enter an agreement with such prospective customers at the time such payment or transfer of title of property is made binding Dealer to hold such monies or property in trust as provided above.

### TERMINATION

(10) This agreement may be terminated at any time at the will of either party by written notice to the other party given either by registered mail or by personal delivery and such termination shall operate to cancel all orders for Company products theretofore received by Company and not delivered. It is, however, agreed in connection with such right of termination:

### Notice of Intention

(a) That in case of termination by Company, notice of intention to so terminate shall be given to Dealer sixty (60) days prior to actual termination date by either of the methods of termination mentioned above, except that no prior notice need be given in case of death, insolvency or bankruptcy of Dealer, or of appointment by a court of a receiver, trustee or custodian for Dealer or Dealer's business, or of an assignment by Dealer for benefit of creditors, or of an assignment or attempted assignment of interest by Dealer, or in event Dealer is a partnership, of disagreement between partners, or in event Dealer

is a corporation, of litigation or proceedings preventing corporation from electing in due course its Board of Directors, appointing its officers, or preventing its Board of Directors or officers from acting or otherwise functioning in an ordinary course of business.

### Sums Due Company

(b) That, on termination of this agreement, Dealer will immediately pay to Company all sums due Company at the time of such termination.

### Removal of Signs

(c) That, on termination of this agreement, Dealer will immediately remove, at Dealer's expense, all Ford signs from Dealer's place of business and discontinue all advertising of Company products.

### Assignment of Unfilled Orders

(d) That, on termination of this agreement, Dealer will immediately turn over or assign by appropriate documents to Company, or its nominee, all unfilled retail orders and deposits made thereon and names and addresses of its service customers and prospective purchasers, it being intended that this clause shall operate immediately upon termination of this agreement as an assignment of Dealer's rights and interests in and to said orders and deposits.

### Repurchase of Automobiles

(e) That, in event of termination of this agreement by Company, Company shall repurchase immediately from Dealer, and Dealer shall sell to Company, all new unused passenger automobiles, commercial automobiles and trucks of current model in Dealer's possession at time of such termination which were purchased from Company after the thirtieth day prior to giving notice of intention to terminate this agreement, as determined by date of Company's invoice, at price paid Company by Dealer (unless there has been a price reduction and then at current price to Dealer) less cost of transportation of the units from Dealer's place of business to Company's branch under which Dealer operates, and provided such units are in first class saleable condition. In event of termination of this agreement by either Dealer or Company, Company shall have the right and option at its election to repurchase any new and unused passenger automobiles, commercial automobiles or trucks in

Dealer's possession at time of termination on like terms.

### Repurchase of Parts and Accessories

(f) That, in event of termination of this agreement by Company, Company shall repurchase immediately from Dealer and Dealer agrees to sell to Company all new and undamaged genuine Ford, Mercury, Lincoln and Lincoln-Zephyr parts and approved accessories purchased from Company by Dealer after the sixtieth day prior to date of giving notice of intention to terminate this agreement at the prices paid for such parts by Dealer less ten per cent (10%) and less transportation charges thereon from Dealer's place of business to Company's branch under which Dealer operates provided such parts and accessories are in first class saleable condition. Dealer also agrees to carefully pack and box at Dealer's own expense and ship to Company all parts and accessories which Company repurchases under the terms of this subparagraph (f). In case Dealer fails to so box and ship such goods, Company may do so and deduct the expenses thereof from the repurchase price. In event of termination of this agreement by either Dealer or Company, Company may at its option examine the stock of Dealer and select any such genuine parts and approved accessories that Dealer may have at the time of termination and Company shall have the right and option to repurchase on like terms such genuine parts and approved accessories, whether or not damaged as the Company in its absolute discretion may elect.

### Evidence of Title

(g) That, in case of repurchase of Company products by Company as provided in subparagraphs (e) and (f) above, Dealer shall furnish satisfactory evidence of clear title to such property and shall execute and deliver proper instruments of title and in event such property is subject to lien an arrangement shall be made whereby Company will procure such property for such repurchase price with such lien discharged.

### Privilege to Enter Premises

(h) That Dealer hereby expressly consents that Company may enter premises of Dealer to take possession of all or any part of Company products mentioned in subparagraphs (e) and (f) above upon agreeing to pay the repurchase price as provided above.

MISCELLANEOUS PROVISIONS

(11) It is expressly understood and agreed:

### Michigan Agreement

(a) That this agreement has been first signed by Dealer and sent to Company's office at Dearborn, Michigan, for final approval and execution and has subsequently been there signed and delivered on behalf of Company, and the parties hereto intend it to be executed as a Michigan agreement and construed in accordance with the laws of the State of Michigan.

### Company's Agents

(b) That Dealer acknowledges notice that no one except the President, Vice-president, Secretary, or Assistant Secretary of Company is authorized to execute this agreement on behalf of Company or in any manner to enlarge, vary or modify its terms or to terminate it, and they only by an instrument in writing. This agreement shall not bind Company until it is signed by one of the officers named above.

### Representatives and Date Effective

(c) That Dealer admits that no representations or statements have been made to him on behalf of Company which would in any way tend to change or to modify the terms or any of them of this agreement, or which would in any manner prevent this agreement from going into full force and effect upon being executed by Company.

### Termination of Prior Agreements

(d) That this agreement terminates and supersedes all prior Ford Sales Agreements, if any, between the parties hereto.

### Assignment

(e) That this agreement may not be assigned by Dealer without the written assent of Company, executed by one of the officers authorized to execute this agreement.

### Separability

(f) That, if any provision of this agreement is invalid or unenforceable, this agreement shall be considered divisible as to such provision and the remainder of the agreement valid and binding as though such provision were not included therein.

### LIMITATION OF COMPANY'S LIABILITY

(12) The requirements and limitations of this agreement as to the facilities to be supplied by Dealer, as to the conduct of the business of dealing in Company products and as to relationships between Dealer and others are intended only to protect the good name and good will and business of Company, to assure Company that Company products will be made available to public and that service facilities will be made available to ultimate users of its products, and to assure or inform Company of the financial stability of Dealer. It is distinctly understood that this agreement contemplates that Dealer will acquire Dealer's own plant and facilities in accordance with Dealer's own discretion and will purchase Company products as Dealer's own and resell them to customers selected by Dealer, all in conformity with the requirements and limitations herein specified but otherwise in Dealer's own discretion. Nothing herein contained shall impose any liability on Company for any expenditures made or incurred by Dealer in preparation for performance or in performance of this agreement.

In witness whereof the parties have executed this agreement as of the day and year first above written.

Ford Motor Company

By ————————————

  Assistant Secretary

————————————
(Dealer's Trade Name)
By ————————————
(Signature and Title)